10 A.3d 267

Mark L. HELPIN

v.

**TRUSTEES OF the UNIVERSITY OF PENNSYLVANIA,**
Marjorie Jeffcoat, Thomas Freitag, and Lawrence M.
Levin.

**Appeal of Trustees of the University of Pennsylvania.**

**Mark L. Helpin, Appellant**

v.

Trustees of the University of Pennsylvania, Marjorie Jeffcoat,
Thomas Freitag, and Lawrence M. Levin, Appellees.

Supreme Court of Pennsylvania.

Argued May 12, 2010.

Decided Dec. 21, 2010.

46

Edward David Rogers, Arthur Makadon, Geoffrey A. Kahn, Ballard Spahr Andrews & Ingersoll, L.L.P., Philadelphia, for Trustees of the University of Pennsylvania.

James Adam Funt, Greenblatt Funt & Flores, L.L.C., Patricia V. Pierce, Amy Louise Rosenberger, Willig, Williams & Davidson, for Mark L. Helpin.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice McCAFFERY.

This case originated as an employment dispute sounding in, *inter alia,* breach of contract. The issue before this Court is whether a damages award for lost future income derived from business profits should be discounted to present value.

The relevant facts are as follows. Mark L. Helpin, D.M.D., ("Dr. Helpin") accepted a position in 1989 at the School of Dental Medicine at the University of Pennsylvania, with primary responsibilities as the Director of Pediatric Dentistry at the Children's Hospital of Philadelphia ("CHOP"). In an offer letter to Dr. Helpin dated September 1, 1989, then-Dean Raymond J. Fonseca, D.M.D., informed Dr. Helpin that his base salary for the 1989–90 academic year would be $60,000. In addition, this base salary was to be supplemented with bonuses and salary increments, which the offer letter set forth as follows:

> In the future, patient care activities at CHOP will offer you the opportunity for bonuses and salary increments, with 50% of CHOP Dental's net operations available to you for such increases. I envision that a large portion of your future salary will, in fact, be derived from the net operations and success you will have at CHOP. I assure you this financial and salary/bonus arrangement will continue even if you no longer serve as Director or Chairman.

Letter to Dr. Helpin from Dean Fonseca, dated 9/1/89 (Plaintiff's Exhibit P–1).

In 1996, Dr. Helpin was promoted to associate professor, in which capacity he could be terminated only for "just cause" or in the event that he was not able to generate sufficient income to offset his salary and expenses, pursuant to the policies of the University of Pennsylvania ("Penn"). Dr. Helpin remained at CHOP until December 2003, each year having available 50% of the profits from the CHOP dental clinic to use for any purpose he wished, including paying himself or reinvesting in the clinic. In December 2003, Marjorie Jeffcoat, D.M.D., the then-new dean of the School of Dental

Medicine, transferred Dr. Helpin from CHOP to Penn's dental clinic in Bryn Mawr. In September 2004, Dr. Helpin gave notice of his intention to resign from Penn at the end of the year, citing intolerable working conditions and a reduction in his salary, which was no longer linked to the CHOP dental clinic profits.

In 2005, Dr. Helpin brought an action in, *inter alia*, breach of contract against the Trustees of the University of Pennsylvania, and tortious interference with prospective economic relationship against Penn; Dean Jeffcoat; Thomas Freitag, the Associate Dean for Finance of the School of Dental Medicine at the University of Pennsylvania; and Lawrence M. Levin, the Chief of the Division of Oral and Maxillofacial Surgery at the University of Pennsylvania Health System. A jury heard testimony over a period of three weeks in June 2007.

At the end of Dr. Helpin's case, the trial court granted the defendants' motion for a nonsuit on the claim of tortious interference with prospective economic relationship, thereby dismissing Drs. Jeffcoat, Freitag, and Levin from the action. However, the jury returned a verdict in favor of Dr. Helpin on the breach of contract claims and awarded him $4.04 million in damages. The jury found that Penn had constructively discharged Dr. Helpin without "just cause," and had improperly failed to continue to pay him 50% of the profits from the CHOP dental clinic. Penn filed a post-trial motion seeking judgment notwithstanding the verdict or a new trial, and Dr. Helpin filed a "conditional motion for post-trial relief and to award interest." The trial court denied all post-trial motions and entered judgment on the jury's verdict on December 10, 2007.

The Superior Court affirmed. *Helpin v. Trustees of the University of Pennsylvania*, 969 A.2d 601 (Pa.Super.2009). Penn then filed a petition for allowance of appeal to this Court, seeking a new trial with respect to damages only. Dr. Helpin filed a "conditional cross-petition for allowance of appeal" to this Court, seeking review *only* if this Court

granted Penn's petition. Both petitions were granted, limited respectively to the following questions:

Should damages for future income that would have been calculated as part of a business's profits be discounted to present value?

*Helpin v. Trustees of the University of Pennsylvania,* 603 Pa. 60, 981 A.2d 1280 (2009).

Did the trial court properly grant a nonsuit on [Dr. Helpin's] claim for tortious interference with prospective economic relations?

*Helpin v. Trustees of the University of Pennsylvania,* 603 Pa. 398, 984 A.2d 478 (2009).

 We begin with Penn's appeal, which presents a question of law as to the calculation of damages for lost future income that would have been derived from a specified percentage of the profits of a business. Because this is a question of law, our standard of review is de novo and our scope is plenary. *In re Novosielski,* 992 A.2d 89, 99 (Pa.2010). The legal background and principles relevant to the issue before us are as follows.

Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

*Ferrer v. Trustees of the University of Pennsylvania,* 573 Pa. 310, 825 A.2d 591, 610 (2002).

 The purpose of a damage award is to place the non-breaching party "as nearly as possible in the same position [it] would have occupied had there been no breach." *Lambert v. Durallium Products Corporation,* 364 Pa. 284, 72 A.2d 66, 67 (1950).

The measure of damages for breach of contract is *compensation* for the loss sustained. The aggrieved party can recover nothing more than will compensate him.

*Id.* (emphasis in original).

 Loss of future earnings, if proven, is properly included in a damage award. *See, e.g., Robertson v. Atlantic Richfield Petroleum Products Company,* 371 Pa.Super. 49, 537 A.2d 814, 823 (1987) (in a breach of employment contract case, declining to grant remittitur with respect to the jury's award of damages for lost future earnings); *see also Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027, 1029–30 (1980) (in a wrongful death/survival action, discussing the calculation of damages for lost future earnings). Obviously, future earnings cannot be calculated with mathematical precision and exactness. *Jones & Laughlin Steel Corporation v. Pfeifer,* 462 U.S. 523, 546, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) ("[B]y its very nature the calculation of an award for lost earnings must be a rough approximation."). The law does not permit a damages award to be based on mere guesswork or speculation, but rather requires a reasonable basis to support such an award. *Kaczkowski, supra* at 1030; *see Robertson, supra* at 823 (concluding that the jury's award for lost future earnings was based on reasonable assumptions and supported by the evidence). In practice, estimation of future earnings has been neither straightforward nor without controversy.[1]

In 1916, the United States Supreme Court held that, when damages are based upon the deprivation of future pecuniary benefits, any lump-sum award should be discounted to the

---

1. The inherent and unavoidable lack of precision in the calculation of future losses based upon an individual's prospects has been the subject of judicial observation. The United States Supreme Court has recognized the difficulty in estimating an award for lost future earnings:

 We do not suggest that the trial judge should embark on a search for 'delusive exactness.' It is perfectly obvious that the most detailed inquiry can at best produce an approximate result.

 *Jones & Laughlin Steel Corporation v. Pfeifer,* 462 U.S. 523, 552, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) (citation omitted).

 *See also Conte v. Flota Mercante Del Estado,* 277 F.2d 664, 669 (2d Cir.1960) ("We recognize the delusive exactness of all this since, among other defects, life expectancies are averages. . . .").

"present value" of those benefits. *Chesapeake & Ohio Railway Co. v. Kelly*, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916). Implicit in this holding was the Court's assumption that any monetary award would be safely invested by the awardee, and accordingly would earn interest for the duration of the award. Relying on the principle that damages should be limited to **compensating** the injured party for the deprivation of future benefits, the High Court determined that "adequate allowance [must] be made, according to circumstances, for the earning power of money." *Id.* at 491, 36 S.Ct. 630. If the earning power of the monetary damage award were not taken into account, then the true value of the award would be greater than the amount to which the aggrieved party was entitled, resulting in over compensation. *Id.* at 489, 493, 36 S.Ct. 630. Although finding it "self[-]evident that a given sum of money in hand is worth more than the like sum of money payable in the future," the Court declined to set forth a formula that should be used to calculate the discount of a damages award to present value *Id.* at 489, 36 S.Ct. 630. Rather, the Court left such matters to "the law of the forum." *Id.* at 490–91, 36 S.Ct. 630.

In 1922, in a personal injury case, this Court held that a jury must discount an award of future damages to present value and that, in such a calculation, "interest must be computed at the lawful rate of 6 [six] per cent." *Windle v. Davis*, 275 Pa. 23, 118 A. 503 (1922); *see also Kaczkowski, supra* at 1030 n. 10 (discussing *Windle* ). More than forty years later, in *Gregorius v. Safeway Steel Scaffolds Company of Pittsburgh*, 409 Pa. 578, 187 A.2d 646, 650 (1963), this Court rejected the appellant/plaintiff's assertion that the six percent interest rule of *Windle* was "antiquated and unrealistic" in view of modern economic conditions. While recognizing that interest rates varied from day to day and from place to place, this Court nonetheless concluded that "[t]here must be a fixed rule to aid juries in calculating the present worth" of future damages, and that "a change in the rule would lead only to confusion and chaos and add greater difficulty in the trial of such cases." *Gregorius, supra* at 650. Justice Musmanno vigorously dis-

sented in *Gregorius* and would have modified the six percent rule of *Windle,* reasoning that "[e]veryone knows that obtaining a return of 6% on one's money today is like growing watermelons in the Sahara." *Gregorius, supra* at 650 (Musmanno, J., dissenting).

Not until 1980, in *Kaczkowski, supra,* a wrongful death and survival action, did this Court abandon *Windle's* six percent rule in the context of lost future earning capacity. The decedent in *Kaczkowski* was a 20–year–old man who had been studying computer operations at the time of his death in a motor vehicle accident. After liability for the decedent's death had been established and during retrial on the question of damages, the trial court refused to allow plaintiff's expert to testify regarding a four percent annual increment to the decedent's projected salary to account for the impact on his lost future earnings of both the inflation rate and productivity gains [2]. The trial court held that any evidence of an annual increment percentage, whether based on inflation or productivity, was not admissible; however, the court did instruct the jury to discount the decedent's projected lost earnings to present value by assuming that any damage award would earn six percent interest. The jury returned a verdict of $30,000 on behalf of the decedent's estate. This Court reversed and remanded for a new trial on damages, reasoning that, in order to compensate fully for the decedent's loss of future earnings, it was necessary to take into account both the impact of inflation and increases in productivity, as discussed below.

Considering first the impact of inflation, *Kaczkowski* noted that, in the absence of inflation, there was no economic disagreement with the theory behind discounting future damages awards to present value. *Id.* at 1030 n. 10. However, economic data established that "[e]ven though the rate of

2. As discussed in the text *infra,* productivity includes factors such as age, maturity, education, skill, and technology advances. *Kaczkowski, supra* at 1029 n. 5, 1031, 1033–34.

Inflation is defined in *Kaczkowski* as "the increase in the volume of money and credit relative to available goods resulting in a substantial and continuing rise in the general price level." *Id.* at 1029 n. 4 (quoting Webster's, Third International Dictionary (1965)).

inflation has not been numerically the same [since 1940], the presence of inflation as a factor in our economy has been constant." *Id.* at 1033. Recognizing inflation's potential to reduce an initially generous award for future damages, we concluded that "inflation should be reflected in an award of lost future earnings." *Id.* at 1029–30. As we summarized in *Kaczkowski, supra* at 1037, because inflation has become an inherent part of our economy, "it is no longer legitimate to assume the availability of future interest rates by discounting to present value without also assuming the necessary concomitant of future inflation."

 To compensate for the competing effects of interest and inflation on a lump-sum damages award for lost future earnings, we adopted the "total offset" approach, which is based on the following assumption:

> Under the total offset method, a court does not discount the award to its present value but assumes that the effect of the future inflation rate will completely offset the interest rate, thereby eliminating any need to discount the award to its present value.

*Id.* at 1036.

Thus, the total offset method assumes that, viewed long term, inflation rate and interest rate will completely offset each other.

> Since over the long run interest rates, and, therefore, the discount rates, will rise and fall with inflation, we shall exploit this natural adjustment by offsetting the two factors in computing lost future earning capacity. We are satisfied that the total offset method provides at least as much, if not greater, accuracy than an attempt to assign a factor that would reflect the varying changes in the rate of inflation over the years. Our experiences with the use of the six percent discount rate suggest the difficulties inherent in such an approach. As to the concomitant goals of efficiency and predictability, the desirability of the total offset method is obvious. There is no method that can assure absolute accuracy. An additional feature of the total offset method is

that where there is a variance, it will be in favor of the innocent victim and not the tortfeasor who caused the loss. *Id.* at 1037–38.

In *Kaczkowski*, we concluded that current economic theory supported adoption of the total offset approach:

Current economic theory demonstrates the accuracy of the total offset approach to inflation. As previously noted, the total offset method assumes that in the long run, future inflation and the discount rate will offset each other. . . . [C]ritics of the total offset approach fail to realize that **future inflation rates and future interest rates do not exist in a vacuum, but co-vary significantly.** It can be stated with assurance that present interest rates depend at least in part upon expectations of future inflation.

*Id.* at 1037 (internal citations omitted) (emphasis added).

■ Finally, the *Kaczkowski* Court also addressed the effect on future earnings of gains in productivity. Productivity includes such factors as age, maturity, education, skill, and technology advances. *Id.* at 1029 n. 5, 1031, 1033–34. We emphasized that productivity is separate and distinct from inflation, and that both had to be considered in estimating lost future earning capacity. *Id.* at 1029 n. 5 and 1032–33. To determine the effect of productivity factors on lost future earnings, we directed the trial court to adopt an evidentiary approach; *i.e.,* the fact-finder should consider relevant evidence as to productivity factors and then make an informed estimation as to lost future earnings based on all the evidence presented.

Thus, to summarize, *Kaczkowski* set forth a framework for calculating a damages award based on lost future earnings. First, with respect to gains in productivity, *Kaczkowski* directed the fact-finder to consider relevant evidence, and then, based on that evidence, to estimate lost future earnings, and award damages that fully compensate the aggrieved party. Second, *Kaczkowski* directed that the award for lost future earnings was *not* to be discounted to present value because, as a matter of law, the future inflation rate was presumed to

offset totally the future interest rate. *Id.* at 1038–39. By adopting the total offset approach, *Kaczkowski* concluded that it was possible "to reflect the impact of inflation in [lost future earning capacity] cases without specifically submitting this question to the jury." *Id.* at 1039.[3, 4]

3. Although implicitly critical of *Kaczkowski*, Penn does not ask this Court to overturn it. *See* Penn's Reply Brief at 3. Rather, Penn argues that *Kaczkowski* established only a "narrow exception" to the general rule requiring that future damages be discounted to present value, which exception applies only to lost future wages, which are subject to cost-of-living or similar inflation-driven increases.

4. Penn points out that *"Kaczkowski* stands alone," in that Pennsylvania is the only state that has established a conclusive legal presumption that the inflation rate totally offsets the interest rate for purposes of a damages award based on lost future earnings. Penn's Brief at 13. Penn also notes that the "United States Supreme Court has twice declined to extend *Kaczkowski* to claims for lost wages under federal statutes, both times reversing appellate courts (this Court and the Third Circuit Court of Appeals, respectively) for doing so." Penn's Brief at 12 (citing *Monessen Southwestern Railway Company v. Morgan*, 486 U.S. 330, 340, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) and *Jones & Laughlin Steel Corporation v. Pfeifer*, 462 U.S. 523, 550, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983)).

 In *Pfeifer*, a work injury case brought under the Longshoremen's and Harbor Workers' Compensation Act, a federal district court in Pennsylvania applied *Kaczkowski* "as a mandatory federal rule of decision" and the Third Circuit affirmed. *Id.* at 550, 103 S.Ct. 2541. The United States Supreme Court vacated and remanded for reconsideration of the damages award, concluding that the use of the approach delineated in *Kaczkowski* was not mandatory in federal courts, even though it "has the virtue of simplicity and may even be economically precise." *Id.* The Court declined to direct the district court to use **any** particular approach in place of *Kaczkowski*, but rather required the court to "make a deliberate choice, rather than assuming that it [was] bound by a rule of state law." *Id.* at 553, 103 S.Ct. 2541.

 While analyzing the circumstances presented in *Pfeifer*, the Supreme Court compared several methods, including the total offset approach of *Kaczkowski*, that had been used by the federal judiciary, the states, or our sister common law nations to account for the impact of inflation on lost future income. *Id.* at 538–48, 103 S.Ct. 2541. The *Pfeifer* litigants and amici had urged the Court "to select one of the many rules that have been proposed and establish it for all time as the exclusive method in all federal trials for calculating an award for lost earnings in an inflationary economy;" however, the Court refused to do so. *Id.* at 546, 103 S.Ct. 2541. While declining to select any particular approach as the federal standard, the High Court noted that "nothing prevents parties interested in keeping litigation costs under control from stipulating to [the approach of *Kaczkowski*] before trial." *Id.* at 550, 103 S.Ct. 2541.

It must be noted that this Court decided *Kaczkowski* narrowly. Specifically, we stated that, with respect to the calculation of future damages "in other contexts," we did not wish to disturb the requirement that an award be discounted to present value, assuming an interest rate of six percent. *Id.* at 1037 n. 21. We now face one of those "other contexts" in the instant case, to wit, should Dr. Helpin's damages award for lost future earned income, part of which derives from profits of a dental clinic, be governed by *Kaczkowski's* total offset approach.

Penn argues that its damages expert was erroneously barred from presenting evidence as to the present value of Dr. Helpin's lost future earned income. The trial court relied on *Kaczkowski* to hold that no present value discount should be applied to Dr. Helpin's lost future earnings because the total offset approach was established law in Pennsylvania under the circumstances of this case. Before reviewing the trial court's application of *Kaczkowski*, we must first consider in some detail what occurred at trial.

During Dr. Helpin's case-in-chief, he presented the testimony of his damages expert, Edwin Rosenthol, a certified public accountant. Notes of Testimony ("N.T."), 6/8/07 (a.m.), at 80–118. Mr. Rosenthol testified that, based on his calculations,

In *Morgan, supra,* a railroad employee filed a negligence action in state court under the Federal Employers' Liability Act. Relying on *Kaczkowski*, the trial judge refused to instruct the jury as to discounting a damages award for lost future earnings to present value. This Court affirmed. The United States Supreme Court reversed and remanded, concluding that the trial judge had erred by applying *Kaczkowski's* total offset approach, a rule of state law, to an action under federal law. The Court determined that by requiring the jury to follow *Kaczkowski's* total offset approach, the trial judge "improperly took from the jury the essentially factual question of the appropriate rate at which to discount [the damages award under the Federal Employers' Liability Act] to present value." *Morgan, supra* at 341–42, 108 S.Ct. 1837. However, as in *Pfeifer*, the Court also stated that the parties were free to stipulate to the use of the total offset method. *Id.* at 342 n. 11, 108 S.Ct. 1837. Thus, as Penn correctly notes, the United States Supreme Court has not made the total offset approach of *Kaczkowski* the standard for federal trials involving damages for lost future earnings. However, the High Court has not selected **any** particular approach as a single federal standard, and has not barred the use of the total offset approach under appropriate circumstances in federal trials.

Dr. Helpin suffered a net loss in earned income of $5,795,796 due to Penn's breach of contract. *Id.* at 89, 116–117. As to the methodology and assumptions used to calculate this loss, Mr. Rosenthol explained that there were two components to Dr. Helpin's earned income: first, his base salary from Penn, and second, his income from CHOP's dental clinic, which included a percentage of the clinic's net profit as well as periodic bonuses. *Id.* at 100–101. Although Penn cross-examined Mr. Rosenthol in detail, at no time did Penn object to his failure to discount his calculation of lost future income to present value. Indeed, the concept of discounting to present value was not even mentioned by either party in the context of Mr. Rosenthol's testimony. N.T., 6/8/07 (p.m.), at 5–19. Thus, to sum up Dr. Helpin's damage evidence, it was presented to the jury without any discount to present value and without relevant objection.

It was ten days after Mr. Rosenthol's testimony, during the testimony of Penn's damages expert, Dr. Brian Sullivan, that the concept of discounting future loss to present value was introduced into the proceedings. N.T., 6/18/07, at 4–55. Dr. Sullivan, a forensic economist, testified that, according to his calculations, Dr. Helpin's loss of future earnings was between $456,071 and $713,023.[5] *Id.* at 32–33. Although Dr. Sullivan's report, like Mr. Rosenthol's report, was not admitted into evidence, Dr. Sullivan testified with the aid of a chart, referred to as "Defense Exhibit 30" ("Exhibit D–30"), which was shown to the jury. Exhibit D–30 summarized Dr. Sullivan's analysis and presented his figures in tabular form. When Penn's counsel started to question Dr. Sullivan about his discount of Dr. Helpin's lost future earnings to present value, Dr. Helpin's counsel objected. N.T., 6/18/07, at 34. After an *in camera* conference with counsel, the court sustained the objection "[f]or the moment," and refused to allow questioning of Dr. Sullivan as to the concept or use of present value discounting. *Id.* at 38; *see also id.* at 74. During cross-examination of Dr.

---

5. The range of lost earnings in Dr. Sullivan's calculations arose from his use of two different assumptions as to Dr. Helpin's age at retirement as well as from different estimations as to the level of bonus payments he would receive from his new employer.

Sullivan, Dr. Helpin's counsel moved to strike Exhibit D–30 because it showed future earnings discounted to present value. The court deferred its ruling on this motion to strike.

Later in the afternoon, the court held another *in camera* conference with counsel concerning Dr. Helpin's motion to strike Exhibit D–30 and, more generally, the applicability of the discounted present value method to future damages under the facts of this case. Dr. Helpin argued that the holding of *Kaczkowski,* which rejected discounting to present value in favor of the total offset approach for calculating future damages due to loss of earnings, applied to the instant case. In contrast, Penn distinguished *Kaczkowski* by arguing that its holding did not apply to lost profits, which constituted the portion of Dr. Helpin's earnings derived from the CHOP dental clinic. Following argument, the trial court excluded Exhibit D–30; however, Dr. Sullivan had already completed his testimony and had used Exhibit D–30. N.T., 6/18/07, at 55, 78. There is no indication from the record that any of Dr. Sullivan's testimony regarding his calculations of Dr. Helpin's lost earned income was stricken.

In this appeal, Penn continues to assert that future damages in the form of lost profits are inherently distinct from future damages in the form of lost wages because profits "depend on myriad factors having nothing to do with inflation, including supply and demand, competition, sales volume, macroeconomic conditions, cost and profitability analysis, revenue forecasts, marketing and advertising, and the condition of the industry and the local and/or regional economy." Penn's Brief at 15. Penn argues that "the central rationale" of *Kaczkowski, i.e.,* that " 'in the long run, future inflation and the discount [*i.e.,* interest] rate will offset each other[,]' . . . applies only to types of future damages, like wages, that co-vary with inflation because only in that context does the 'offset' concept even arguably make economic sense." Penn's Brief at 15 (citing *Kaczkowski,* 421 A.2d at 1037). Accordingly, in Penn's view, lost future profits should not be subject to *Kaczkowski's* total offset rule, but rather should be discounted to present value using a prevailing interest rate. Finally, Penn asserts that

the total offset method "is wholly inappropriate for lost profits because it creates a windfall for the plaintiff." *Id.*

We cannot agree that this Court's approach to damages based on lost future earnings, as set forth in *Kaczkowski,* is inapplicable to the circumstances presented here. If, as Penn seeks, the trial court merely discounted Dr. Helpin's damages award for lost future earned income to present value, then the negative effects of inflation on the ultimate purchasing value of the award would be ignored, contrary to *Kaczkowski,* and Dr. Helpin would be under-compensated.

We recognize that a large portion of Dr. Helpin's lost future earned income, like his past earned income, is attributable to his contractual share of the profits from CHOP's dental clinic. We further acknowledge, as Penn asserts, that the quantitative level of these profits will likely be determined by a multitude of factors, many of which may not be directly tied to the rate of inflation. Under *Kaczkowski,* such factors should be—and indeed were—a topic of evidence-based inquiry at trial. Mr. Rosenthol, Dr. Helpin's economics expert, testified at length and was subjected to extensive cross-examination as to his estimations of Dr. Helpin's lost future earned income from the CHOP clinic profits. Penn's economics expert, Dr. Sullivan, also testified as to his estimations of Dr. Helpin's lost future earned income. The jury heard and presumably incorporated into its future damages award all the testimony from both parties regarding factors relevant to projections of clinic profitability.

The total offset approach, as set forth by this Court in *Kaczkowski,* is not relevant to the consideration of such case-specific, individualized factors as those offered by Mr. Rosenthol and Dr. Sullivan. Rather, *Kaczkowski's* total offset approach addresses the very general effects of inflation on the value, over time, of a lump-sum damages award for lost future earnings. *Kaczkowski's* central assumptions—that inflation must be considered and that, over time, inflation rate totally offsets interest rate—are not dependent on the individual facts surrounding any specific lump-sum future damages award.

Dr. Helpin's damages for his lost future earned income were awarded, as is the general practice, in one lump-sum, even though the lost earnings project years into the future. There is no doubt that the rate of inflation in succeeding years will affect the ultimate value of Dr. Helpin's lump-sum award. Therefore, to compensate Dr. Helpin fully and fairly, it is necessary to make some estimations regarding not just the earning capacity of the award as realized through interest payments, but also the ultimate value of the award as diminished by inflation. To ignore the impact of years of inflation on a substantial proportion of Dr. Helpin's lost future earned income, while simultaneously applying a discount to present value based on the prevailing interest rate, would lead to unacceptable under-compensation of Dr. Helpin. The approach we set forth in *Kaczkowski* was designed to address such under-compensation, by taking into account not only future interest rates, but also future inflation rates. The concerns, the rationales, and the analysis set forth in *Kaczkowski* for lump-sum damages awards for lost future earnings are simply not altered by the fact that a substantial percentage of Dr. Helpin's lost future earned income derives from profits of the CHOP clinic.

We do not accept Penn's assertion that *Kaczkowski* applies only to cases involving lost future wages that "co-vary with inflation," presumably via periodic cost-of-living adjustments or a similar mechanism. Penn's Brief at 15. The determinative co-variance in *Kaczkowski* was between inflation, which decreases the purchasing power of money over time, and interest, which increases the value of money over time. By adoption of the total offset approach, *Kaczkowski* resolved the specific problem of the competing effects of these two factors—inflation and interest—on a lump-sum damages award for lost future earnings. The competing effects of these two co-variables neither disappear nor become irrelevant—and *Kaczkowski* is not rendered inapplicable—merely because a portion of Dr. Helpin's future lost earned income is derived from profits of the CHOP clinic.

We recognized in *Kaczkowski* that, given the variability in inflation and interest rates, "[t]here is no method that can assure absolute accuracy" in predicting them over a period of years. *Kaczkowski, supra* at 1038. After carefully examining a variety of methods, we concluded that the total offset approach "provides at least as much, if not greater, accuracy than an attempt to assign a factor that would reflect the varying changes in the rate of inflation over the years." *Id.* In addition, *Kaczkowski* recognized that the total offset approach had virtues related to judicial efficiency and predictability:

> [Under the total offset approach, l]itigators are freed from introducing and verifying complex economic data. Judge and juries are not burdened with complicated, time consuming economic testimony. Finally, by eliminating the variables of inflation and future interest rates from the damage calculation, the ultimate award is more predictable.

*Id.* at 1038.

We are not persuaded that these considerations have any less significance or import or relevance merely because, as in Dr. Helpin's case, the lost future earnings at issue are partially derived from future profits of a business. The general effect of inflation to diminish the purchasing power of a lump-sum award for lost future earned income does not depend on whether some of those lost future earnings are derived from profits. We conclude that *Kaczkowski's* total offset approach is applicable to the circumstances presented here, and accordingly, we affirm.[6]

6. Disputing *Kaczkowski's* basic assumptions and questioning the wisdom of *Kaczkowski's* holding, the dissent "would hold that lump-sum awards based on lost future income should be discounted to present value." Dissenting Opinion (Saylor, J.) at 63, 10 A.3d at 278. However, the only question before us is whether *Kaczkowski's* holding should be applied when the lost future income at issue is derived specifically from business profits. Penn's position is that *Kaczkowski* should not be applied to future business profits, but rather should be strictly limited to its context, *i.e.,* future lost wages. Notably Penn does not propose that *Kaczkowski* be overturned. The dissent agrees with Penn that *Kaczkowski* should not be extended; however, the dissent also implies that *Kaczkowski* was wrongly decided. Dissenting Opinion (Saylor, J.) at 65, 10 A.3d at 279 ("[N]ot only did the *Kaczkowski* Court fail to

Because we have affirmed, there is no need to address the issue provisionally raised by Dr. Helpin as to the trial court's grant of nonsuit.

Justices EAKIN, BAER and TODD join the opinion.

Justice SAYLOR files a dissenting opinion in which Chief Justice CASTILLE and Justice ORIE MELVIN join.

Justice SAYLOR, dissenting.

I respectfully dissent, as I would hold that lump-sum awards based on lost future income should be discounted to present value.

establish a persuasive basis for total-offset, but it appeared content to introduce unnecessary, systemic imprecision in the law of remedies."); *id.* at 66, 10 A.3d at 280 ("This is not the only theoretical shortcoming appearing on the face of the *Kaczkowski* decision."); *id.* at 67, 10 A.3d at 280 ("Thus, from a theoretical standpoint, the Alaska court's limitation is economically sensible, and *Kaczkowski's* self-described 'eclectic method' is overly compensatory."); *id.* at 68, 10 A.3d at 281 ("Even to the degree *Kaczkowski* is entitled to deference under *stare decisis,* for several reasons, I believe it would be best not to extend its approach to other scenarios ... [T]he *Kaczkowski* Court's decision to apply the total-offset rule to damage estimates that include projected raises above and beyond predictable seniority-based increases stems from an analytical error, and ultimately results in overcompensation. Thus, it would be best, in my view, not to expand that error into other types of civil cases.")

The instant case does not present an appropriate forum for a consideration of whether *Kaczkowski* was wrongly decided and ultimately should be overturned. No analytical error or fundamental economic deficiency in *Kaczkowski's* holding was claimed or argued below, and the lower courts did not consider such possibilities. Thus, in the absence of any testimony or other evidence of record, it would be imprudent to conclude here that *Kaczkowski's* theoretical underpinnings are weak and its basic assumptions are unsupportable. Rather, we note that the *Kaczkowski* Court examined a variety of approaches to calculation of future lost wages, recognized that *all* approaches required estimates and predictions, and concluded that the total offset method was preferable for a variety of reasons, including accuracy, predictability, and judicial ease and efficiency.

With regard to the specifics of the instant case, the dissent suggests that "blind application" of the total offset method is inappropriate because, *inter alia,* Dr. Helpin's damages expert "**may** have already folded an expectation of price inflation into his estimate, not only with regard to lost profits or bonuses, but relative to [Dr. Helpin's] base academic salary." Dissenting Opinion (Saylor, J.) at 69, 10 A.3d at 281 (emphasis added). This appears to be speculation on the part of the dissent, and not a factual point raised or argued by the parties.

As the majority observes, this Court in *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980), developed the total-offset approach on the theory that "the effect of the future inflation rate will completely offset the interest rate, thereby eliminating any need to discount the award to its present value." Majority Opinion at 54, 10 A.3d at 272 (quoting *Kaczkowski*, 491 Pa. at 579, 421 A.2d at 1036). On its face, this pronouncement appears to say that conservative lenders will not expect any real growth for their holdings, but will only lend at an interest rate capable of keeping pace with inflation. However, the assumption that low-risk investments will always yield a real growth rate of zero seems unrealistic, and it has not been adopted by other jurisdictions. For example, the United States Supreme Court has referred to a "real interest rate" of approximately two percent. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 542 n. 25, 103 S.Ct. 2541, 2553 n. 25, 76 L.Ed.2d 768 (1983). Other courts likewise recognize the existence of growth in safe investments even after inflation has been factored out.[1]

1. *See, e.g., Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384, 387–88 (2d Cir.1975) (accepting a real growth rate, and hence a discount rate, of one-and-one-half percent); *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39 n. 10 (2d Cir.1980) (noting a general agreement among economists that, when inflation rates are relatively stable, the real yield of money is approximately two percent); *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199 (7th Cir.1982) (Posner, J.) ("In periods when no inflation is anticipated, the risk-free interest rate is between one and three percent."); *id.* at 1200 (indicating that one-half percent is "lower than most economists believe [the real rate of interest on safe investments] to be for any substantial period of time"); *Feldman v. Allegheny Airlines, Inc.*, 382 F.Supp. 1271, 1293–94 (D.Conn.1974) (explaining that: an inflation-adjusted discount rate should be used; the rate should be about two percent during stable periods of low inflation; and it should be approximately one and one-half percent when inflation is high and/or unpredictable); *see also Pfeifer*, 462 U.S. at 548–49, 103 S.Ct. at 2556 (holding that a trial court using a real growth rate of between one and three percent will not be reversed if it explains its choice); *Culver v. Slater Boat Co.*, 722 F.2d 114, 122 (5th Cir.1983) (same); *cf. Schnebly v. Baker*, 217 N.W.2d 708, 728 (Iowa 1974) (permitting use of a zero real growth rate, but only where the evidence adduced at trial demonstrated that inflation and nominal interest were equal), *abrogated in part on other grounds, Franke v. Junko*, 366 N.W.2d 536 (Iowa 1985).

Notably, *Kaczkowski* effectively conceded this point, indicating that interest rates depend only "in part" on expectations of future inflation. *Kaczkowski,* 491 Pa. at 581, 421 A.2d at 1037. Nevertheless, *Kaczkowski* then stated that, since nominal interest rates tend to "rise and fall with inflation, we shall exploit this natural adjustment by offsetting the two factors in computing lost future earning capacity." *Id.* at 581, 421 A.2d at 1037–38. This statement appears to be a *non sequitur:* simply because the two rates "rise and fall" together, it does not follow that they are numerically identical. Thus, the Court assigned no legal significance to the potentially substantial numerical difference between the inflation rate and the nominal interest rate, stating only that to the degree there is a variance between the two, it will benefit "the innocent victim and not the tortfeasor who caused the loss." *Id.* at 582, 421 A.2d at 1038. Accordingly, not only did the *Kaczkowski* Court fail to establish a persuasive basis for total-offset, but it appeared content to introduce unnecessary, systemic imprecision in the law of remedies.[2] It also failed to give any attention to whether a one-size-fits-all approach is realistic, given that different industries have different wage-growth patterns. *See* Michael I. Krauss & Robert A. Levy, *Calculating Tort Damages for Lost Future Earnings: The Puzzles of Tax, Inflation, and Risk,* 31 Gonz. L.Rev. 325, 344 (1995–96) (hereinafter, *"Calculating Tort Damages"*) ("Even if wage growth and inflation were roughly equal for the nation as a whole, they might be vastly different for certain industries."); *id.* at 344 n. 87 (pointing out that, during the period 1975 through 1988, the annual increase in an employee's hourly value to his employer (which correlates with wage growth)

---

2. I am not convinced that systematically over-penalizing civil defendants is appropriate, not only because it runs counter to basic notions of corrective justice, but because civil liability is decided on a preponderance of the evidence, which subsumes a risk that civil defendants will wrongly be found liable. *See generally Commonwealth v. Maldonado,* 576 Pa. 101, 109, 838 A.2d 710, 715 (2003) (observing that the preponderance standard stems from a belief that the plaintiff and defendant should equally share the risk of an erroneous verdict). Thus, as we already accept that a significant number of liability verdicts may be incorrect, it does not seem equitable to incorporate a structural inaccuracy inflating the amount of damages.

ranged from 11.8 percent in the semiconductor manufacturing industry, to negative 1.4 percent in the laundry business).

Since *Kaczkowski* was decided, moreover, the General Assembly has provided some guidance, at least with regard to lost earnings resulting from medical negligence. In particular, the Medical Care Availability and Reduction of Error (MCARE) Act provides:

> Future damages for loss of earnings or earning capacity in a medical professional liability action shall be reduced to present value based upon the return that the claimant can earn on a reasonably secure fixed income investment. These damages shall be presented with competent evidence of the effect of productivity and inflation over time. The trier of fact shall determine the applicable discount rate based upon competent evidence.

40 P.S. § 1303.510. This shows the Legislature's recognition that inflation and interest rates will not always be equal, and that competent evidence is necessary to determine the appropriate discount rate as a factual matter. *Accord Monessen Sw. Ry. Co. v. Morgan,* 486 U.S. 330, 342, 108 S.Ct. 1837, 1846, 100 L.Ed.2d 349 (1988); *Culver,* 722 F.2d at 122; 22 AM.JUR.2D *Damages* § 154 & n. 4 (2010) (collecting cases).

This is not the only theoretical shortcoming appearing on the face of the *Kaczkowski* decision. The second one, related to the first, has to do with the Court's apparent misunderstanding of the role of expected future salary raises occasioned by industry-wide productivity enhancements and the employee's rising skill and experience level. In particular, the *Kaczkowski* rule was developed by reference to the federal district court's *Feldman* decision and two cases from the Alaska Supreme Court, *Beaulieu v. Elliott,* 434 P.2d 665 (Alaska 1967), and *State v. Guinn,* 555 P.2d 530 (Alaska 1976). *Kaczkowski* observed that, in *Feldman,* a detailed evidentiary presentation was made at trial concerning the decedent's likely career path, including her growth in productivity and concomitant salary increases that would have exceeded raises based only on seniority. *Feldman* thus allowed for a large lost-earnings estimate, but reduced it to present value using a

partially-offset discount rate of one-and-one-half percent—representing the nominal interest rate on government securities reduced by the expected rate of inflation. On the other hand, the Alaska cases adopted a total-offset rule, but limited its application to estimates of lost earnings that only folded in seniority-based raises. *See Guinn,* 555 P.2d at 545–46. This Court dismissed such limitation as tantamount to a partial reversion to the old rule of discounting based on the nominal interest rate, *see Kaczkowski,* 491 Pa. at 580, 421 A.2d at 1037 ("[I]t appears that the Alaska court's conception that merit based increases are 'speculative' is a throwback to the previously rejected traditional approach."), and instead opted for a combination of the two methods, permitting enhanced lost-earnings estimates that include expected gains from experience, skill, and industry-wide productivity improvements, while prohibiting any discounting of that larger estimate. *See id.* at 579, 421 A.2d at 1036.

What *Kaczkowski* failed to realize is that, because safe investments tend to offer a real interest rate that, while low, is above zero, the prospect of having a lump-sum award grow in real terms would approximately compensate for the victim's lost opportunity to benefit from these other factors—i.e., his increasing value to his employer due to skill and experience, as well as industry-wide productivity gains, presumably due to improved technology and business methods. *Accord Pfeifer,* 462 U.S. at 549, 103 S.Ct. at 2557 (recognizing a "sound economic argument" for the total-offset rule as applied to estimates that exclude these latter factors, while only including "individual seniority and promotion gains"). Thus, from a theoretical standpoint, the Alaska court's limitation is economically sensible, and *Kaczkowski's* self-described "eclectic method" is overly compensatory. *Kaczkowski,* 491 Pa. at 579, 421 A.2d at 1036. *See generally* Michael T. Brody, *Inflation, Productivity, and the Total Offset Method of Calculating Damages for Lost Future Earnings,* 49 U. Chi. L.Rev. 1003, 1022 (1982) ("The *Kaczkowski* variant of the total offset method suffers from the opposite problem: because it increases the [basic lost earnings] prediction by expected productivity gains

and then fails to discount by the real interest rate, it is overcompensatory."); *Calculating Tort Damages*, 31 GONZ. L.REV. at 344 n. 85 ("[T]he Pennsylvania approach is the equivalent of a negative discount rate, i.e., wages are accelerated for inflation plus productivity and then discounted for inflation alone."). Further, Pennsylvania is apparently the only jurisdiction that requires application of this method. *See* Thomas R. Ireland, *Total Offsets in Forensic Economics: Legal Requirements, Data Comparisons, and Jury Comprehension*, 9–Fall J. LEGAL ECON. 9, 15 (1999); 22 AM.JUR.2D *Damages* § 132 n. 1 (2010).[3]

Even to the degree *Kaczkowski* is entitled to deference under *stare decisis*, for several reasons, I believe it would be best not to extend its approach to other scenarios, such as the present breach-of-contract action involving, *inter alia*, lost profits and/or bonuses. First, as explained above, the *Kaczkowski* Court's decision to apply the total-offset rule to damage estimates that include projected raises above and beyond predictable seniority-based increases stems from an analytical error, and ultimately results in overcompensation. Thus, it would be best, in my view, not to expand that error into other types of civil cases. *See generally Kaczkowski*, 491 Pa. at 579 n. 21, 421 A.2d at 1036 n. 21 ("We do not wish to disturb [the requirement of discounting] in calculating future damages in other contexts. We refrain from attempting to fashion broad general rules as a panacea." (internal quotation marks omitted)).

Second, a contract breach does not ordinarily result in physical injury or death to the victim. This is relevant because, even if one assumes the validity of the *Kaczkowski* approach as to tortious conduct, within a contract-breach framework the victim can reasonably expect to continue to "progress[ ] in his chosen occupation in terms of skill, experience and value to the employer." *Id.* at 579, 421 A.2d at 1036

3. Intermediate appellate courts in at least two other jurisdictions allow the use of total-offset, but do not require it, leaving the question to the discretion of the trial court. *See Wal–Mart Stores, Inc. v. Coleman*, 745 So.2d 423, 424 (Fla.Dist.Ct.App.1999); *Paducah Area Pub. Library v. Terry*, 655 S.W.2d 19, 25 (Ky.Ct.App.1983).

(internal quotation marks omitted). This, in turn, means that the theoretical foundation supporting the total-offset rule, at least in the terms explicated by *Kaczkowski,* is substantially undermined for purposes of contract-based actions. Here, it is not disputed that Dr. Helpin was able to continue to work and progress in his field of dentistry notwithstanding the contract breach. It seems equally likely that, if better technology, more efficient business methods, or other factors eventually result in enhanced productivity throughout Dr. Helpin's field as a whole, he will benefit financially from those improvements.

There are other features specific to this case, moreover, that counsel against a blind application of the total-offset method. First, Dr. Helpin's damages expert, Edwin Rosenthol, C.P.A., may have already folded an expectation of price inflation into his estimate, not only with regard to lost profits or bonuses, but relative to Dr. Helpin's base academic salary. In particular, Mr. Rosenthol assumed that Dr. Helpin would receive a yearly two-and-one-half percent structural salary increase in accordance with departmental policy. *See* N.T., June 8, 2007 (a.m.), at 106. It seems reasonable that some of that annual increase represents a cost-of-living adjustment intended to compensate for the effects of general price inflation; if so, at least some discounting would be necessary to avoid a double recovery. *See generally Pfeifer,* 462 U.S. at 538, 103 S.Ct. at 2551; *O'Shea,* 677 F.2d at 1200 ("[B]uilding inflation into the estimate of future lost earnings and then discounting using [only] the real rate of interest would systematically overcompensate."); *Alaska Airlines, Inc. v. Sweat,* 568 P.2d 916, 933 (Alaska 1977) (same as to lost retirement benefits).

Just as significantly, Mr. Rosenthol factored in projected increases in clinic-based bonuses and/or profits occasioned by a number of items, such as: the addition of new operating rooms and other treatment facilities at the clinic; the hiring of additional medical staff; enhanced efficiencies with regard to the procedures used to schedule patients for treatment; and the inclusion of subsidies from the hospital in the amount of $116,000 per year—subsidies that were not certain to continue.

*See* N.T., June 8, 2007 (a.m.), at 107–113; N.T., June 8, 2007 (p.m.), at 12. *See generally id.* at 7, 9 (reflecting Mr. Rosenthol's testimony on cross-examination that his calculation was based entirely on "what Dr. Helpin felt the clinic would do under his leadership, not what it would do under someone else's leadership"). All of these factors go well beyond the predictable, yearly, seniority-based increases that comprised the foundation for the total-offset rule utilized in *Beaulieu*, or even the expected merit-based raises that underpinned the rule in *Kaczkowski*. Therefore, applying total-offset in the present situation represents a significant expansion of the method that does not appear warranted by precedent or the facts of this case. *See City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 226 (Alaska 1978) (refusing to extend *Beaulieu* to contract cases involving lost future profits), *overruled in part on other grounds, Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211 (Alaska 1984).[4]

Accordingly, I respectfully dissent from the majority's decision to expand the rule of *Kaczkowski* to encompass future lost earnings in the present case.

Chief Justice CASTILLE and Justice ORIE MELVIN join this dissenting opinion.

---

4. I note, as well that the *Beaulieu* line of decisions has been overridden by a statute, *see* Alaska Stat. § 09.17.040(b) (1986), the purpose of which "was to bring Alaska in line with other states which reduce future economic awards to present value[.]" *Beck v. State*, 837 P.2d 105, 117 (Alaska 1992); *see* Brief for Appellant at 12–13. According to the Alaska court, this legislative measure "was a response to a liability insurance crisis and was intended to increase the availability and affordability of liability insurance." *Beck*, 837 P.2d at 117 (internal quotation marks omitted). As a policy matter, the present majority's reasoning could apply equally to all awards of future damages, and its effect will likely be to decrease the affordability of liability insurance.