J-A28034-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| MCCARL'S SERVICES, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID DARGENZIO AND HUCKSTEIN | : | |
| MECHANICAL SERVICES, INC. | : | |
| | : | No. 302 WDA 2020 |
| | : | |
| APPEAL OF: DAVID DARGENZIO | : | |

Appeal from the Judgment Entered February 20, 2020
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  No. GD-13-023104

| MCCARL'S SERVICES, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID DARGENZIO AND | : | No. 331 WDA 2020 |
| HUCKESTEIN MECHANICAL | : | |
| SERVICES, INC. | : | |

Appeal from the Judgment Entered February 20, 2020
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD13-023104

BEFORE:  OLSON, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    FILED FEBRUARY 25, 2021

J-A28034-20

These consolidated[1] cross-appeals arise from the judgment[2] entered February 20, 2020, in the Allegheny County Court of Common Pleas following the non-jury verdict entered in favor of David Dargenzio (Dargenzio) on claims filed by McCarl's Services Inc. (McCarl's), and in favor of McCarl's on cross-claims filed by Dargenzio.[3] This action involves a non-compete clause in an employment contract. At Docket No. 302 WDA 2020, Dargenzio contends the trial court erred in finding McCarl's was not liable for claims of breach of contract, violations of Pennsylvania's Wage Payment and Collection Law[4] (WPCL), and fraud in the inducement. At Docket No. 331 WDA 2020, McCarl's

_____

[1] On March 1, 2020, this Court consolidated these appeals sua sponte. Order, 3/10/20.

[2] Both the notice of appeal and the notice of cross-appeal purport to appeal from the order entered February 6, 2018. However, that "order," which was docketed on February 9, 2018, announced the trial court's non-jury verdict. See Order of Non-Jury Verdict, 2/9/18. Rather, the appeal properly lies from the February 20, 2020, entry of judgment on the verdict, following the parties' filing of post-trial motions. See Crosby v. Com., Dep't of Transp., 548 A.2d 281, 283 (Pa. Super. 1988) (explaining "the proper, procedural course to pursue in perfecting an appeal from an adverse jury verdict is to reduce the verdict to judgment and take an appeal therefrom"). As will be discussed infra, both parties properly preserved their claims in timely filed post-trial motions, although the trial court never ruled on those motions before judgment was entered. We have corrected the captions accordingly.

[3] McCarl's also sued Huckstein Mechanical Services, Inc. (Huckstein) — the competitor Dargenzio worked for after leaving McCarl's. However, McCarl's settled its claims against Huckstein prior to trial. See McCarl's Praecipe to Settle and Discontinue, 1/6/17. Thus, Huckstein is not a party to this appeal.

[4] 43 P.S. 260.1 to 260.45.

- 2 -

argues the trial court erred in finding Dargenzio was not liable on claims of breach of contract, breach of duty of loyalty, and civil conspiracy. We affirm.

I. FACTS & PROCEDURAL HISTORY

The facts underlying this appeal were summarized by the trial court as follows:

> This case addresses Dargenzio's departure from McCarl's and new employment at Huckstein. McCarl's is a Pennsylvania business corporation with a principal place of business located in Cranberry Township, PA. McCarl's is in the business of designing, installing and repairing commercial heating, ventilation and air conditioning ("HVAC") systems in the Greater Pittsburgh area. On or about May 12, 1994, McCarl's hired Dargenzio as a Sales Engineer. On or about April 6, 1998, McCarl's promoted Dargenzio to Sr. Project Manager and enrolled Dargenzio in a Phantom Stock Plan. On April 6, 1998, both Kevin McCarl[, President and CEO of McCarl's,] and Dargenzio signed an Employment Agreement ("1998 Employment Agreement"), which included an agreement not to compete. On the same day, both parties signed "Attachment A" to the Employment Agreement, which detailed the compensation and Phantom Stock Policy. McCarl's argued that this Phantom Stock was the consideration for the Employment Agreement and that this Employment Agreement remained in place though Dargenzio's employment until his departure in 2013.

> However, another agreement between the parties went into effect on January 1, 2010 ("2010 Agreement"), when Dargenzio transitioned from a full[-]time employee to a commissioned sales representative. Dargenzio argued that this 2010 Agreement replaced the 1998 Employment Agreement, hence rendering the agreement's prohibition against competition no longer operative.[5]

---

[5] The 2010 Agreement was updated "towards the end of 2012." See N.T. Trial, 4/18-20/17, at 73. Both documents are attached to Dargenzio's

> Dargenzio began communication with [Huckstein's President and CEO,] Wendy Staso concerning potential employment at Huckstein on or about September 12, 2013. Dargenzio submitted his letter of resignation to Kevin McCarl on November 12, 2013. Dargenzio commenced employment at Huckstein on or about November 18, 2013. At the time Dargenzio commenced employment at Huckstein, Huckstein was a competitor of McCarl's and located within 100 miles of Pittsburgh, PA[, which was a violation of the parties' non-compete agreement].

Trial Ct. Memorandum & Order, 2/8/18, at 2-3 (unpaginated).[6]

McCarl's filed a civil action against Dargenzio and Huckstein on December 9, 2013. In an amended complaint filed on March 14, 2014, McCarl's asserted the following claims: (1) against Dargenzio, (a) two counts of breach of contract, seeking money damages and injunctive relief, (b) breach of duty of loyalty, and (c) civil conspiracy; (2) against Huckstein, (a) interference with contract, (b) interference with business relations, and (c) unfair competition; and against both Dargenzio and Huckstein, civil conspiracy. See McCarl's Amended Complaint, 3/14/14. Specifically, McCarl's alleged that Dargenzio breached the non-compete clause in his 1998 Employment Agreement when he accepted employment with its competitor, Huckstein, and breached his duty of loyalty to the company when he diverted business leads to Huckstein while still employed by McCarl's. Id. at ¶¶ 5-9,

_____

amended Answer, New Matter and Counterclaim. See Dargenzio's Amended Answer, New Matter & Counterclaim, 6/10/14 at Exhibits B, C.

[6] The trial court filed two opinions in this case. The first, entitled "Memorandum and Order," was filed on February 8, 2018, and accompanied its non-jury verdict. The second was filed on August 3, 2020, in response to the parties' Pa.R.A.P. 1925(b) statements of errors complained of on appeal.

15-18. McCarl's also asserted Dargenzio conspired with Huckstein to do so. Id. at ¶ 44.

Huckstein and Dargenzio each filed answers with new matter. In addition, Dargenzio filed counterclaims seeking relief for (1) breach of contract, (2) violations of the WPCL, and (3) fraud in the inducement. See Dargenzio's Amended Answer, New Matter & Counterclaim at ¶¶ 64-122. Specifically, Dargenzio asserted McCarl's breached its agreement to compensate him under the Phantom Stock Plan upon his semi-retirement in 2009 as evidenced in two novations to the 1998 Employment Agreement executed in 2010 and 2012. Id. at ¶¶ 66-77. He further alleged McCarl's verbally agreed to pay him commissions on projects which required the use of his out-of-state licenses. Id. at ¶ 78. When McCarl's informed him the Phantom Stock Plan had no value, and continued to fail to provide him the compensation he was owed, Dargenzio claims, he was constructively terminated in 2013. Id. at ¶¶ 79-82. His cause of action under the WPCL is related to McCarl's failure to pay him compensation under the Phantom Stock Plan. See id. at ¶¶ 98-106. Lastly, Dargenzio alleged McCarl's fraudulently induced him to continue his employment by offering him compensation via the Phantom Stock Plan, knowing the Plan had no value. See id. at ¶¶ 116-22.

Both Dargenzio and Huckstein filed motions for summary judgment on December 15, 2014. On February 5, 2015, McCarl's filed a motion for partial summary judgment on Dargenzio's counterclaims. After conducting argument, the trial court denied all three motions on July 6th. Thereafter, on

January 6, 2017, McCarl's filed a praecipe to mark its claims against Huckstein settled and discontinued.   See McCarl's Praecipe to Settle & Discontinue, 1/6/17.

The case proceeded to a three-day, non-jury trial from April 18 to 20, 2017.   Both parties subsequently submitted post-trial briefs.   On February 9, 2018, the trial court filed a memorandum and order, concluding neither party was entitled to relief on any claim.   The court's "Order of Non-Jury Verdict" specifies the trial court found as follows:

(1)  McCarl's Breach of Contract Claim in favor of Dargenzio;

(2) McCarl's Breach of Duty of Loyalty Claim in favor of Dargenzio;

(3) McCarl's Civil Conspiracy Claim in favor of Dargenzio;

(4) Dargenzio's Breach of Contract Claim in favor of McCarl's;

(5)  Dargenzio's Violation of Pennsylvania Wage Payment and Collection Law Claim in favor of McCarl's;

(6) Dargenzio's Fraud in the Inducement Claim in favor of McCarl's.

Order of Non-Jury Verdict, 2/9/18.[7]

Both Dargenzio and McCarl's filed timely post-trial motions.[8]   While these motions were still pending, Dargenzio filed a notice of appeal on March

_____

[7] The trial court's memorandum was docketed on February 8, 2018.  However, the Order of Non-Jury Verdict was not docketed until the next day, February 9th.

[8] Pursuant to the Pennsylvania Rules of Civil Procedure, post-trial motions must be filed within 10 days of "the filing of the decision" after a non-jury trial.   Pa.R.C.P. 227.1(c)(2).   Once one party has filed a timely post-trial

8, 2018. McCarl's then filed a cross-appeal on March 14th. On April 26, 2018, this Court quashed both appeals sua sponte because the post-trial motions were still pending in the trial court. See Docket No. 497 WDA 2018 (Dargenzio appeal); Docket No. 382 WDA 2018 (McCarl appeal).

The trial court docket reveals no further activity for nearly two years. On February 20, 2020, Dargenzio filed two praecipes for entry of judgment on the court's verdict in favor of Dargenzio on McCarl's complaint, and in favor of McCarl on Dargenzio's counterclaims.[9] See Dargenzio's Praecipe for Judgment on Non Jury Verdict, 2/20/20. Thereafter, Dargenzio filed a timely notice of appeal on February 25, 2020, and McCarl's filed a timely cross-appeal on March 4, 2020.[10] See Pa.R.A.P. 903(a) (notice of appeal "shall be filed

_____

motion, "any other party may file a post–trial motion within ten days after the filing of the first post–trial motion." Id. Here, Dargenzio filed a post-trial motion on February 20, 2018. Although this was 11 days after the entry of the court's verdict, the 10th day — February 19, 2018 — was President's Day, a court holiday. Thus, his motion was timely filed. See 1 Pa.C.S. § 1908 (for purposes of computing time, "[w]henever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday . . . such day shall be omitted from the computation"). McCarl's then filed a timely post-trial motion within 10 days, on February 27, 2018.

[9] It is well-settled that the parties were required to file post-trial motions in order to preserve issues for appeal. Chalkey v. Roush, 805 A.2d 491, 496 (Pa. 2002). However, there is no accompanying rule requiring the trial court to address the parties' post-trial motions, and, in the present case, the court provided no explanation for its failure to do so. Nonetheless, the parties were permitted to praecipe for entry of judgment after the court did not enter an order disposing of the motions within 120 days. See Pa.R.C.P. 227.4(1)(b).

[10] Both parties subsequently complied with the trial court's orders directing them to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

within 30 days after the entry of the order from which the appeal is taken"), (b) (when timely appeal is filed, any other party may file cross-appeal within 14 days).

## II. DAREGENZIO'S APPEAL (Docket 302 WDA 2020)

Dargenzio raises the following issues on appeal:

1. Whether the Trial Court erred in determining that Dargenzio did not "retire" where, in 2009, Dargenzio openly announced his intention to retire and then withdrew from his position as Sales Manager of McCarl's to assume the role of a commissioned sales representative[?]

2. Whether the Trial Court erred in determining that Dargenzio was not "constructively discharged" in 2013 as a result of either McCarl's failure to pay Dargenzio earned benefits under the Phantom Stock Plan or McCarl's failure to pay Dargenzio earned commission for projects that required the use of Dargenzio's Ohio and West Virginia licenses[?]

3. Whether the Trial Court erred in determining that Dargenzio was not entitled to relief under the Pennsylvania [WPCL] where McCarl's failed to pay Dargenzio earned benefits under the Phantom Stock Plan both subsequent to Dargenzio's retirement in 2009 and subsequent to Dargenzio's constructive discharge in 2013[?]

4. Whether the Trial Court erred in determining that Dargenzio was not fraudulently induced by McCarl's to sign the 1998 Agreement or the 2010 Agreement where McCarl's knew or should have known that the Phantom Stock Plan would lack funds sufficient to compensate Dargenzio upon either his retirement or discharge without cause[?]

Dargenzio's Brief at 4-5.[11]

_____

[11] Dargenzio listed two additional questions, which did not raise any further claims of error on his own behalf, but rather were merely posed in response to McCarl's cross-appeal.

In his first two issues, Dargenzio challenges the trial court's finding that McCarl's did not breach the 1998 Employment Agreement when it failed to pay him earned benefits under the Phantom Stock Plan in either 2009, when he announced his retirement, or 2013, when he was "constructively discharged." See Dargenzio's Brief at 10, 14.

When considering the verdict in a non-jury trial, our standard of review is well-settled:

> We must determine whether the findings of the trial court are supported by competent evidence and whether the trial judge committed error in the application of law. Additionally, findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed absent error of law or abuse of discretion.

Yablonski v. Keevican Weiss Bauerle & Hirsch LLC, 197 A.3d 1234, 1238 (Pa. Super. 2018) (citation omitted). "As an appellate court, we cannot disturb the finding of the trial court on the witnesses' credibility." Id. at 1240 (citation omitted).

Moreover, when the issue involves contract interpretation, we must bear in mind:

> "[T]he interpretation of the terms of a contract is a question of law for which our standard of review is de novo, and our scope of review is plenary." Furthermore:
>
>> Contract interpretation … requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 957 (Pa. Super. 2011) (citations omitted), aff'd, 106 A.3d 656 (Pa. 2014).

By its own terms, the Phantom Stock Plan was created "to provide deferred compensation to certain key employees of McCarl's[.]" Dargenzio's Amended Answer, New Matter & Counterclaim at Exhibit E, Phantom Stock Plan (PSP) at 1. Those employees were awarded "performance units," each of which equated to one share of stock in the company. Id. Kevin McCarl explained the Plan gave the participating employees "an opportunity to share in the growth and increase profitability in the company." N.T. Trial at 48. When the company's profits rose above the baseline — established at $5,859,000 — the participants were be entitled to a percentage "of the increased value," which was determined by a Phantom Stock Committee established by the Board of Directors.[12] See id. at 55; PSP at 1, 6. A participant was entitled to payment under the Plan when their employment was terminated (1) upon their retirement, (2) by McCarl's for reasons other than cause, or (3) "as a result of death or disability." PSP at 3. The value of the participant's stock was then calculated by the Committee based upon the company's profits above the baseline. See N.T. Trial, 59-60 (value of phantom stock for 2004 was zero because earnings of company "was less than the value of the baseline"); 61-62 (value of phantom stock for 2005 was $500

_____

[12] When the Plan was created, the Phantom Stock Committee consisted of Kevin McCarl, then Chief Financial Officer John Gregg McMillan, Jr., and Dargenzio. N.T. Trial at 53.

per share). Further, the Plan explicitly provided that a participant's performance units would be cancelled, and all payments forfeited, if, inter alia, the participant "voluntarily terminate[d] his employment." PSP at 4. When Dargenzio resigned in November of 2013, he received no compensation under the Phantom Stock Plan.

On appeal, Dargenzio insists he is entitled to payment under the Plan either because he effectively retired in 2009, or because he was constructively discharged in 2013. See Dargenzio's Brief at 10, 14. With regard to his "retirement," Dargenzio contends he told Kevin McCarl that he intended to retire at the end of 2009, and "openly announced his retirement during the company's retreat" in early 2009. Id. at 12. He maintains he then "withdrew from his position as Sales Manager," which is memorialized in the 2010 Agreement, and "changed from a full-time employee to a commission-based sales representative." Id. at 13.

Citing Franklin Cty. Career & Tech. Ctr. v. Franklin Cty. Career & Tech. Ctr. Educ. Ass'n, PSEA/NEA, 39 A.3d 456 (Pa. Cmwlth. Ct. 2012), Dargenzio contends that "[u]nder Pennsylvania law, 'retirement' has been defined to include 'withdrawal from one's position.'" Dargenzio's Brief at 10. Further, he maintains "[a]n employee can retire . . . without ceasing employment or withdrawing from the labor force." Id. Thus, here, Dargenzio insists that "[b]y announcing his retirement, voluntarily withdrawing from his position as Sales Manager of McCarl's, and attempting to collect earned benefits under the Phantom Stock Plan, [he] retired from McCarl's" in 2009.

Id. at 13 (emphasis added). Moreover, he asserts the fact he remained a commissioned sales representative is "irrelevant." Id.

The trial court, however, found Dargenzio voluntarily terminated his employment in 2013, thus, forfeiting his right to any compensation under the Phantom Stock Plan. See Trial Ct. Memorandum & Order at 8-9. With regard to Dargenzio's purported "retirement" in 2009, the court concluded "Dargenzio did not retire from McCarl's[, but rather,] merely changed his role with McCarl's and . . . continued to work for McCarl's until 2013." Trial Ct. Op., 8/3/20, at 8. We agree.

Kevin McCarl acknowledged that Dargenzio talked about retiring at the end of 2009, so that he could "slow down at some point and move to North Carolina." N.T. Trial at 126. However, he also testified that Dargenzio (who was 46 years old at the time), did not retire at that time upon learning the Phantom Stock shares had no value at the end of 2008. Id. at 126-27, 198. McCarl explained:

> [Dargenzio] thought there was this big payday. He said: I need that damn stock. Other than that, I can't retire, I have to sell my house.

Id. at 127. See also id. at 128 (McCarl stating Dargenzio told him "he had no other means to retire other than the money through the phantom stock, and there wasn't any money in the phantom stock").

Dargenzio implies that his retirement announcement, coupled with his withdrawal from the position as sales manager, triggered McCarl's obligation to pay him compensation pursuant to the Phantom Stock Plan. Dargenzio's

Brief at 13. He notes that in Franklin Cty., the Commonwealth Court determined a teacher had "retired" after being furloughed for several years, despite the fact the teacher requested to retain her furlough rights. See id. at 11. However, we find the facts in Franklin Cty. distinguishable.

In that case, a teacher decided to retire "for financial reasons" after being furloughed for three years. Franklin Cty., 39 A.3d at 457. As such she began receiving retirement benefits. Id. Nevertheless, she requested to remain on the recall list in the event a position for which she was qualified became available. Id. The school refused to pay her accumulated sick leave, arguing she had not "retired" as defined by the collective bargaining agreement. See id. The case proceeded to arbitration, and the arbitrator ruled in favor of the teacher. Id. On appeal, the Commonwealth Court affirmed, holding:

> The definition of "retirement" includes "withdrawal from one's position." The definition does not require complete cessation of employment or withdrawal from the labor force, as [the school] maintains. [The teacher] withdrew from her position as a teacher by notifying [the school] of her retirement and by applying for, and taking, a retirement pension. The fact that [she] retired for financial reasons and hoped to return to teaching via recall did not negate her retirement status at this time.

Id. at 458 (some emphasis omitted and some added). It bears emphasis that the teacher in Franklin Cty. ceased working for her employer at the time she retired. See id. at 457.

Conversely, in the present case, Dargenzio never retired. Rather, he took another position within the company, albeit in a reduced workload

- 13 -

capacity. Kevin McCarl testified Dargenzio was still a full-time employee, eligible for benefits, the company 401-K plan, and a car allowance — his salary, however, changed to commission-based only. See N.T. Trial at 66-68. According to McCarl, Dargenzio "wanted to slow down a bit, he didn't want to attend the weekly sales meetings[.]" Id. at 66. It is undisputed Dargenzio did not receive any retirement benefits at that time. Thus, we agree with the trial court that, for purposes of the Phantom Stock Plan, Dargenzio did not retire in 2009. See Trial Ct. Op. at 8-9.

Similarly, we conclude Dargenzio was not "constructively discharged" when he left McCarl's in 2013. This Court has explained:

> "[C]onstructive discharge of an at-will employee may serve as a basis for tort recovery if the employer has made working conditions so intolerable that an employee has been forced to resign." In this context, "[i]ntolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign, that is, whether he would have had no choice but to resign." It may not be premised upon the conclusion that resignation was the wisest or best decision under the circumstances, nor is it established based on an employee's subjective judgment.

Helpin v. Trustees of Univ. of Pennsylvania, 969 A.2d 601, 614 (Pa. Super. 2009) (citations and footnote omitted), aff'd, 10 A.3d 267 (Pa. 2010).

Here, Dargenzio complains his working conditions at McCarl's became "intolerable" in 2013 because McCarl's refused to pay him earned benefits under the Phantom Stock Plan, as well as "earned commissions for projects that required the use of his Ohio and/or West Virginia licenses." Dargenzio's Brief at 16. He claims he and Kevin McCarl entered into an "oral agreement"

whereby he would receive part of the commissions on out-of-state projects that required the use of his license. Id. Because termination by the company without cause is one of the employment events which triggers payment under the Phantom Stock Plan, Dargenzio insists he is entitled to relief. See PSP at 3.

The trial court, however, found McCarl's did not "constructively discharge" Dargenzio. Trial Ct. Op. at 9. Rather, it concluded Dargenzio "voluntarily terminated" his employment with McCarl's when he resigned and immediately began working for Huckstein. Id. We agree. In his resignation letter, Dargenzio stated he "appreciated the opportunities" he had been given at McCarl's, and described his tenure there as a "pleasurable learning experience." N.T. Trial at 458. Further, he conceded that while he began communicating with the President of Huckstein two months before he resigned from MCarl's, he told them in an email he was "in no hurry to make a move at [that] point[.]"[13] Id. Kevin McCarl denied he had any oral agreement with Dargenzio to pay Dargenzio partial commissions for jobs completed in Ohio and West Virginia, and, McCarl insisted, if there had been such an agreement, it would have been in writing. Id. at 115-17. Moreover, he testified Dargenzio never complained that McCarl's failed to pay him for commissions he believed were due, or indicated that his working conditions were "intolerable." Id. at

_____

[13] Dargenzio insisted that comment was taken out of context. N.T. Trial. at 458. He claimed he "knew [he] had to leave, but it had to be the right circumstances." Id. at 459. However, even this explanation undercuts his insistence that he was subjected to objectively intolerable working conditions.

79. It is evident the trial court simply did not credit Dargenzio's testimony on this claim. Accordingly, no relief is warranted. See Yablonski, 197 A.3d at 1240.

Next, Dargenzio contends the trial court erred in denying him relief under the WPCL. Dargenzio's Brief at 17. "[T]he primary goal of the WPCL is to make whole again, employees whose wages were wrongfully withheld by their employers." Ely v. Susquehanna Aquacultures, Inc., 130 A.3d 6, 13 (Pa. Super. 2015) (citation omitted). Dargenzio's claim, however, rests upon his prior argument that he is entitled to payment under the Phantom Stock Plan, either because he retired in 2009 or was constructively discharged in 2013. See Dargenzio's Brief at 17-18. The trial court succinctly disposed of this issue as follows:

> This argument is completely reliant upon Dargenzio's claim for unpaid compensation pursuant to the Phantom Stock plan. Given that this Court concluded that Dargenzio was not entitled to payments pursuant to the Phantom Stock Plan, Dargenzio's claim under the Pennsylvania Wage Payment and Collection Law must also fail.

Trial Ct. Op. at 9-10. We agree. Thus, no relief is due.

Lastly, Dargenzio contends the trial court erred in concluding he was not "fraudulently induced by McCarl's to sign the 1998 Employment Agreement." Dargenzio's Brief at 18. He insists McCarl's "falsely represent[ed] . . . the value of [the] Phantom Stock Plan" and the fact that another employee actually received compensation under the Plan is irrelevant. Id. at 19. Rather, Dargenzio maintains that "when the 1998 Employment Agreement

was executed, McCarl's knew or should have known that the Phantom Stock Plan would lack sufficient funds to compensate [the participants] upon their retirements." Id. at 19-20.

An actionable claim of fraudulent misrepresentation requires the following elements:

> (1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

Weston v. Northampton Pers. Care, Inc., 62 A.3d 947, 960 (Pa. Super. 2013) (citations omitted). Furthermore, any claim of fraud "must be proven by clear and convincing evidence." Id. (citation omitted).

In rejecting Dargenzio's fraud claim, the trial court opined:

> Of the voluminous amount of testimony on this subject, the most telling piece of evidence was that McCarl's compensated a former employee under the Phantom Stock Plan when [it] terminated that employee without cause. McCarl's employed [McMillan] as CFO from 1994 until 2007. Upon McMillan's termination, McCarl's paid [McMillan] in accordance with the Phantom Stock Plan. Accordingly, this Court correctly found that McCarl's intended to honor the terms of the Phantom Stock Plan, provide[d] employees left on acceptable terms as they are outlined in the Plan. For the reasons stated above, Dargenzio simply did not leave under terms that would allow him to collect payment pursuant to the Phantom Stock Plan.

Trial Ct. Op. at 10.

While Dargenzio insists McCarl's "knew or should have known" the PSP would lack sufficient funds to compensate both participants, him and McMillan,

at the time of their respective retirements, he provides no evidence to support this claim. See Dargenzio's Brief at 19-20. Indeed, the value of the phantom stock, which varied from year to year based upon the company's profits, was determined by the Plan Committee, of which Dargenzio was a member. See N.T. Trial at 53, 58-63. When asked what "misrepresentation" Kevin McCarl made to him regarding the Phantom Stock Plan, Dargenzio replied: "I don't believe he ever had the intent at that point in time of fulfilling his promise." Id. at 468-69. Dargenzio's subjective "belief" that McCarl's never intended to compensate him under the PSP, is simply insufficient to sustain a claim of fraud. See Weston, 62 A.3d at 960. Thus, this claim, too, fails.

Because we detect no error in the trial court's determination that Dargenzio's counterclaims warrant no relief, we affirm the judgment entered in favor of McCarl's.

### III. McCARL'S CROSS-APPEAL (Docket 331 WDA 2020)

McCarl's sets forth the following questions for our review in its cross-appeal:

A. Was [Dargenzio] liable to [McCarl's] for breach of contract?

1. Did [Dargenzio] violate the non-competition covenant contained in the parties' 1998 Employment Agreement?

2. Was the 1998 Employment Agreement supported by adequate consideration?

3. Was there a novation of the 1998 Employment Agreement which superseded the non-competition covenant contained therein?

- 18 -

B. Was [Dargenzio] liable to [McCarl's] for breach of his duty of loyalty to [McCarl's]?

C. Was [Dargenzio] liable to [McCarl's] for the tort of civil conspiracy?

McCarl's Brief at 4.

In its first issue on appeal, McCarl's asserts the trial court erred in denying its claim for breach of contract. Specifically, McCarl's insists the 1998 Employment Agreement, which included the non-compete clause, was supported by valuable consideration — namely, both a $7,000 raise and Dargenzio's enrollment in the Phantom Stock Plan. McCarl's Brief at 10-11. Moreover, it argues the 2010 Agreement, which outlined Dargenzio's change in status to a full-time commissioned sales representative, did not constitute a novation of the 1998 Employment Agreement or replace the prior agreement and concomitant non-compete clause. See id. at 12. Thus, because Dargenzio violated the non-compete clause when he began working for Huckstein only days after resigning from McCarl's, McCarl's contends the trial court erred when it failed to grant relief on its breach of contract claim. Id. at 14-16.

Preliminarily, we note that the inclusion of a covenant not to compete in an employment contract is "generally disfavored" under Pennsylvania law. Socko v. Mid-Atl. Sys. of CPA, Inc., 126 A.3d 1266, 1274 (Pa. 2015). See also Hess v. Gebhard & Co. Inc., 808 A.2d 912, 917 (Pa. 2002) (restrictive covenants in employment contracts "have been historically viewed as a trade restraint that prevents a former employee from earning a living").

Nevertheless, the courts of this Commonwealth will enforce a non-compete clause in an employment agreement "assuming adherence to certain requirements[:]" that the non-compete clause is "(1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer." Socko, 126 A.3d at 1274.

When a non-compete clause is "executed at the inception of the employment, the consideration to support the covenant may be the award of the position itself." Socko, 126 A.3d at 1275. However, where as here, a non-compete agreement is required after the employee has already begun employment,

> it is enforceable only if the employee receives "new" and valuable consideration — that is, some corresponding benefit or a favorable change in employment status. Sufficient new and valuable consideration has been found by our courts to include, inter alia, a promotion, a change from part-time to full-time employment, or even a change to a compensation package of bonuses, insurance benefits, and severance benefits. Without new and valuable consideration, a restrictive covenant is unenforceable. More specifically, the mere continuation of the employment relationship at the time of entering into the restrictive covenant is insufficient to serve as consideration for the new covenant, despite it being an at-will relationship terminable by either party.

Id. (citations and footnotes omitted). See also Davis & Warde, Inc. v. Tripodi, 616 A.2d 1384, 1388 (Pa. Super. 1992) (concluding execution of non-compete clauses by former at-will employees was supported by adequate

consideration; "[n]ot only were they offered continued employment with new responsibilities, but each was given a cash payment, a guarantee of certain job benefits, including a favorable change in the employer's automobile reimbursement policy, and a guaranteed severance benefit in the event of termination").

In the present case, Dargenzio had been employed by McCarl's for four years when he signed the 1998 Employment Agreement. The trial court found "the mere change in Dargenzio's job title and his enrollment in the Phantom Stock Plan did not constitute valuable consideration" for the execution of the non-compete clause. Trial Ct. Op. at 5. The court opined:

> Given that the terms of the restrictive covenant were meant to survive the end of Dargenzio's employment with McCarl's, in order for the Phantom Stock Plan to constitute valuable consideration, the Phantom Stock Plan also needed to survive the end of the employment relationship. McCarl's cannot argue both that the Phantom Stock Plan was valuable consideration for the restrictive covenant, and that Dargenzio is not entitled to any benefit from enrollment in the Plan. Even assuming that the promise of future redemption of the Phantom Stock Plan appeared to be adequate consideration when the agreement was signed, that consideration failed when Dargenzio's units were cancelled. Contingent compensation, where the contingency does not arise, is not valuable consideration.

Id. at 5-6 (citation omitted).

It is evident the trial court considered Dargenzio's enrollment in the Phantom Stock Plan to be the only consideration offered in exchange for the non-compete clause. However, at trial, Kevin McCarl testified that at the time Dargenzio signed the 1998 Employment Agreement, he was also given a new

position as Senior Project Manager, new responsibilities — which included managing another employee and having the opportunity to earn incentives based on that employee's performance — and a 11 to 12% ($7,000 per year) salary increase. See N.T. Trial at 37-39. Furthermore, although the Agreement was signed on April 6, 1998, the salary increase took effect retroactive to January 1st of that year. Id. at 39-40. When asked about these changes to his employment, Dargenzio testified he was "not sure" if his job title changed, and could not "verify" that he received a salary increase, stating he would "have to look at [his] personnel file." Id. at 386-87. However, he never provided any evidence to the contrary.

Thus, even if we disregard Dargenzio's enrollment in the Phantom Stock Plan,[14] we conclude Dargenzio's new job title, new responsibility, and increased salary provided sufficient consideration for the execution of the non-compete clause. See Socko, 126 A.3d at 570-71.

_____

[14] Based upon our disposition, we need not consider whether enrollment in the Plan constituted sufficient consideration for the non-compete clause. We note, however, the trial court provides no support for its assertion that "[c]ontingent compensation, where the contingency does not arise, is not valuable consideration." See Trial Ct. Op. at 6. Here, the contingency did not arise because Dargenzio voluntarily resigned — a disqualifying action under the Plan — not because McCarl's refused to pay him. Moreover, while it is undisputed the phantom stock had no value when Dargenzio first discussed retirement in 2009, there is no evidence that the shares remained valueless in the ensuing years.

The trial court also found, however, that the non-compete clause was unenforceable because it was replaced by the 2010 Agreement. The court opined:

> [T]he 2010 Agreement materially changed the terms of Dargenzio's employment with McCarl's and thereby replaced the 1998 Agreement. The first paragraph of the 2010 Agreement reads as follows:
>
> > This agreement is to represent the understanding between McCarl's . . . and . . . Dargenzio for his changing from a full time employee to commissioned sales rep. This agreement goes into effect January 1, 2010 and continues through December 31, 2010.
>
> The 2010 Agreement provides a new set of duties and obligations between Dargenzio and McCarl's. It changed Dargenzio's position of employment, it changed his ability [to] quality for sales awards, it changed the means by which he was compensated, and it offered him the ability to participate in a deferred compensation plan in lieu of the Phantom Stock Plan. Most importantly, the 2010 Agreement did not contain any restrictive covenant, nor did it make any reference to the restrictive covenant in the 1998 Agreement. Indeed, while the 2010 Agreement stated that it "represent[ed] the understanding between McCarl's . . . and . . . Dargenzio," it did not reference the 1998 Agreement at all. Thus, without a restrictive covenant in the only operative employment agreement between Dargenzio and McCarl's at the time Dargenzio left McCarl's to work for Huckstein, Dargenzio did not breach his employment contract with McCarl's when he accepted employment with a competitor.

Trial Ct. Op. at 6-7. We agree.

Both McCarl's and Dargenzio acknowledged they entered into a new agreement in 2010. Kevin McCarl testified that he prepared the 2010 Agreement — which reflected a "mutual understanding" between the parties — after Dargenzio discussed "slow[ing] down a bit." N.T. Trial at 66-67, 69.

However, he claimed that he did not intend the 2010 Agreement to replace the 1998 Employment Agreement; rather, "[i]t was only to replace the Attachment A that was in the Employment Agreement[,]" which set forth Dargenzio's title, salary and benefits. Id. at 69. See McCarl's Amended Complaint, Exhibit A, 1998 Employment Agreement, Attachment A. Conversely, Dargenzio testified that the 2010 Agreement constituted a "new agreement" between the parties because "the capacity of what [he] did for the company changed completely." Id. at 414. See also id. at 416 (testifying the 2010 Agreement "replaced" the 1998 Agreement). Indeed, under the 2010 Agreement, Dargenzio's title, duties, and salary changed considerably. More importantly, the 2010 Agreement did not include a non-compete clause. Considering this Agreement reflected a decrease in Dargenzio's salary and duties, we conclude it was incumbent upon McCarl's, as the drafter, to explicitly include the non-compete covenant in the new employment agreement – particularly since "some" of the consideration for the non-compete clause (a new position and increased salary), was absent from the new agreement. Thus, McCarl's is entitled to no relief on this claim.[15]

_____

[15] While at various times the parties referred to the 2010 Agreement as a "novation," the trial court did not do so. See Dargenzio's Amended Answer, New Matter & Counterclaim at ¶¶ 74-86; McCarl's Brief at 12-14. Nevertheless, we note:

> The required essentials of a novation are "the displacement and extinction of a valid contract, the substitution for it of a valid new contract, . . ., a sufficient legal consideration for the new

Next, McCarl's contends the trial court erred when it found Dargenzio was not liable for breach of duty of loyalty. McCarl's Brief at 16. Specifically, McCarl's challenges the court's determination that it was required to prove Dargenzio "used confidential information from McCarl's to gain an edge in competition." Id. at 17, quoting Trial Ct. Memorandum and Order at 7. Rather, McCarl's insists it was only required to establish that Dargenzio "perform[ed] acts which are contrary to the interest of his employer." McCarl's Brief at 18. Furthermore, it maintains:

> The record is clear and uncontroverted that, while still employed at McCarl's, Dargenzio referred sales leads to Huckstein which involved McCarl's existing customers; and that he divulged information to Huckstein relating to McCarl's customers' upcoming contracts, projects and bidding practices, in an effort to steer business to Huckstein.

Id. at 17 (record citations omitted).

As agents of their employer, employees owe a duty of loyalty, which requires them to "act solely for the benefit of the [employer] in all matters

_____

contract, and the consent of the parties . . . ." The party asserting a novation or substituted contract has the burden of proving that the parties intended to discharge the earlier contract. Such intention of the parties to effect a novation or substituted contract may be shown by other writings, or by words, or by conduct or by all three.

Buttonwood Farms, Inc. v. Carson, 478 A.2d 484, 486–87 (Pa. Super. 1984) (citations omitted). Here, the trial court found the parties intended for the 2010 Agreement to replace the 1998 Employment Agreement, even if they did not say so expressly. Moreover, the consideration for the new agreement was Dargenzio's reduced workload and office hours.

connected with [their employment]." SHV Coal, Inc. v. Continental Grain Co., 545 A.2d 917, 921 (Pa. Super. 1988), rv'd on other grounds, 587 A.2d 702 (Pa. 1991).[16] "To prevail on a claim of breach of fiduciary duty of loyalty, [an employer] must demonstrate that his [employee] acted for a person or entity whose interests conflicted with the [employer]." Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. 2003), citing Restatement (Second) of Agency § 394 (1958).

Here the trial court concluded Dargenzio did not breach any duty of loyalty owed to McCarl's, his employer. The court found:

> Dargenzio credibly testified that he did not have access to McCarl's full customer list. Dargenzio also testified that he did not need to, and in fact did not, use any confidential information of McCarl's at Huckstein. The only customer that McCarl's presented as "stolen" due to Dargenzio's departure was the Mark West Project. Dargenzio testified that he did not solicit the repair job with Mark West. Rather, Dargenzio explained that a project manager at Mark West sought Dargenzio out to do the repair work because McCarl's performed the work on the original system that now needed premature repairs. Furthermore, Kevin McCarl testified that McCarl's did not utilize exclusive contracts with its customers. Thus, McCarl's customers were free to hire Huckstein without violating any existing agreements with McCarl's.

Trial Ct. Op. at 7-8.

Upon our review of the record, we detect no basis to disagree with the trial court. Preliminarily, we emphasize the trial court found Dargenzio was not bound by the non-compete clause in the 1998 Employment Agreement —

_____

[16] The Supreme Court's reversal in SHV Coal on appeal pertained only to the issue of punitive damages. See SHV Coal, 587 A.2d at 702.

a decision with which we agree.  See supra. Moreover, the Pennsylvania Supreme Court has explained:

> [T]he solicitation of customers and use of customers lists is permissible unless there is a breach of an express contract or violation of some confidence.  There must be some element of fraud or trade secrecy involved  .  .  . But equity is not protecting mere names and addresses easily ascertainable by observation or by reference to directories.

Spring Steels, Inc. v. Molloy, 162 A.2d 370, 372–73 (Pa. 1960) (citation omitted).

In the instant case, the trial court credited Dargenzio's testimony that he did not use any confidential information he obtained while working for McCarl's to solicit clients for Huckstein.  See N.T. Trial at 493.  In support of its claim, McCarl's directs this Court to emails between Dargenzio and Staso, Huckstein's President and CEO, during the two-month period before Dargenzio resigned.  See McCarl's Brief at 17.  It insists these emails prove Dargenzio "set out to divert business, which he was being paid to acquire for [McCarl], to a competitor with whom he had agreed to accept employment."  Id. at 17, quoting SHV, 545 A.2d at 921.  However, with regard to one large client, FedEx, Dargenzio denied soliciting it, and testified instead that the client asked him to obtain a quote from Huckstein because it "did not want to do business with McCarl's anymore."  N.T. Trial at 498-99.  Further, while another email mentioned the Hospital Council's maintenance contract, Kevin McCarl conceded that Dargenzio renewed that contract for McCarl's before he left.  Id. at 235.  See also id. at 440-43 (Dargenzio explaining that client for Mark

- 27 -

West project reached out to him when McCarl's was not able to fix a problem). Thus, because we conclude the trial court's findings are supported by the record, no relief is warranted.

Lastly, McCarl's contends the trial court erred when it found Dargenzio was not liable for civil conspiracy. It maintains Dargenzio and Huckstein "conspired to engage in unfair competition by . . . diverting sales leads from McCarl's to Huck[ ]stein, and utilizing confidential information which Dargenzio had acquired at McCarl's to further the business interests of Huckstein." McCarl's Brief at 19-20. Specifically, McCarl's insists it lost a boiler replacement contract at Hospital Council to Huckstein after Dargenzio — while still employed at McCarl's — informed Huckstein of the upcoming project. Id. at 20-21.

> This Court has explained the tort of civil conspiracy as follows:
>
> [A] civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose. A conspiracy becomes actionable when some overt act is done in pursuance of the common purpose or design held by the conspirators, and actual legal damage results.

Baker v. Rangos, 324 A.2d 498, 506 (Pa. Super. 1974). Furthermore, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979).

The trial court briefly disposed of this claim as follows: "Having already determined that McCarl's failed to prove that Dargenzio or Huckstein used

confidential information to obtain an unfair advantage over McCarl's, this Court correctly held that McCarl's claim for Civil Conspiracy also failed." Trial Ct. Op. at 8. We agree. Regardless of whether Dargenzio provided Huckstein with sales leads while still employed by McCarl's, McCarl's presented no evidence that Huckstein and Dargenzio agreed together to divert clients away from McCarl's in an effort to undermine its business. See Baker, 324 A.2d at 506; Thompson Coal Co., 412 A.2d at 472. Thus, we conclude the trial court did not err in entering a verdict for Dargenzio on McCarl's civil conspiracy claim.

Thus, because we conclude the trial court's verdict is both supported by the record, and free of legal error, we affirm the judgments entered in favor of Dargenzio on McCarl's claims, and in favor of McCarl's on Dargenzio's counterclaims.

Judgments affirmed.

Judge Murray joins this Memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/25/2021

- 29 -