**[J-31-2023] [MO:Brobson, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| VINCULUM, INC., | : | No. 74 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court dated November 29, |
| | : | 2021 at No. 2048 and 2127 EDA |
| v. | : | 2020 Affirming the Judgment of the |
| | : | Bucks County Court of Common |
| | : | Pleas, Civil Division, at No. 2015- |
| GOLI TECHNOLOGIES, LLC, | : | 06333 dated September 22, 2020. |
| | : | |
| Appellee | : | ARGUED:  May 24, 2023 |

## CONCURRING OPINION

**JUSTICE WECHT**                                     **DECIDED:  February 21, 2024**

I join the Majority in full.  I write separately to expand on the reasoning as to Part III.B.  I agree with the Majority that Pennsylvania law does not prohibit the award of lost profit damages for the breach of a non-compete covenant that are incurred after the covenant expires.  I would likewise conclude that Vinculum nonetheless failed to establish such damages in this case.  But I would add a comment on the burden that a party must carry in order to prove these damages—or any kind of lost profits, for that matter.  Moreover, although there is ultimately no factual basis for lost profit damages beyond the term of the non-compete covenant in this case, we would be remiss not to discuss their probable limits.

Relying upon ordinary contract principles, the Majority holds that "a party harmed by the breach of a non-compete," like any other party harmed by the breach of a contract, "should be afforded the opportunity to seek and prove the ordinary, foreseeable, and

certain damages that flow from the breach."[1]  Among those damages are lost profits, to include prospective or "future lost profits."[2]  The Majority identifies restrictive covenants as "important business tools," and it finds nothing in the law to prohibit the application of these general contract principles to non-compete agreements.[3]  As such, the Majority concludes that prospective or future lost profit damages—including those incurred after the expiration of the non-compete agreement—are generally available in this context, unless the parties themselves restrict them contractually.[4]

Nonetheless, the Majority finds that the evidence presented was insufficient to prove lost profits beyond the expiration of the non-compete in the instant case.[5]  The trial court sustained Goli LLC's objection to questions regarding its profits after the non-compete had expired on the belief that such damages were unavailable as a matter of law.  But the Majority concludes that Vinculum had not laid the proper foundation for its line of questioning.[6]  To provide that foundation, the Majority would rightly require

---

[1]    Maj. Op. at 29; *see also Helpin v. Trustees of Univ. of Pa.*, 10 A.3d 267, 270 (Pa. 2010) (stating that when one party breaches a contract, the other may generally recover "whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty").

[2]    *See* Maj. Op. at 29; *see also AM/PM Franchise Ass'n v. Atl. Richfield Co.*, 584 A.2d 915, 925 n.19 (Pa. 1990) (noting our "extensive history of allowing claims for loss of prospective profits in breach of contract case[s]"); *Mass. Bonding & Ins. Co. v. Johnston & Harder, Inc.*, 22 A.2d 709, 714 (Pa. 1941) ("[I]f it reasonably appears that profits would be realized if the contract were carried out, and that the loss of such benefits necessarily followed the breach, their amount may constitute the true measure of damages." (quoting *Macan v. Scandinavia Belting Co.*, 107 A. 750, 753 (Pa. 1919))).

[3]    *See* Maj. Op. at 36, 29-30.

[4]    *See id.* at 29-30.

[5]    *See id.* at 30.

[6]    See *id.*

Vinculum to show "that Goli LLC's breach of the Consulting Agreement caused Vinculum's business tangible harm in the year or years following the expiration of the non-compete period—*i.e.*, a connection between Goli LLC's breach and Vinculum's lost profits."[7] Vinculum falls short, the Majority reasons, because it failed to draw that connection: upon review of the record and the arguments advanced by the parties, the Majority concludes that there was simply no evidence that the breach "somehow placed Vinculum at a market disadvantage" that would give rise to lost profits.[8]

The Majority notes that Goli LLC existed before the Consulting Agreement, and the evidence does not attribute its post-non-compete successes (and Vinculum's corresponding losses) to Goli LLC's premature competition, rather than to Goli's legitimate, pre-Consulting Agreement existence. The Majority also notes that Vinculum failed to show that (1) the six consultants[9] Vinculum lost were the same six that Goli LLC successfully placed following the expiration of the non-compete; or (2) "but for Goli LLC's intervention in the market, Vinculum would have been the successful vendor out of the other 200 or 300 vendors to fill those open consulting positions at PennDOT."[10] I write separately to emphasize—as the Majority acknowledges[11]—that, in order to establish a foundation for lost profits, Vinculum was not required to prove these latter two facts.

---

[7]     *Id.*

[8]     *Id.* at 36.

[9]     The Majority uses the word "client" both to refer to PennDOT (the "Client" whom Goli LLC was prohibited from soliciting for a period of time under the Consulting Agreement, *see* Compl., Ex. 1, Consulting Agreement, R.R. at 12), and, sometimes, to the IT professionals that the parties placed with PennDOT. Because the Consulting Agreement refers to the IT professionals as consultants, I do the same.

[10]    Maj. Op. at 35.

[11]    *See id.* at 35 n.15.

Lost profit damages—the prospective variety included—require a showing, not just that the defendant has profited, but also that the defendant's breach has harmed the plaintiff's business.[12] However, our lost profits jurisprudence does not require exact proof of that harm. While it is true that we do not permit a damages award "based on mere guesswork or speculation,"[13] we have recognized that prospective lost profit damages are difficult, if not impossible, to calculate with precision.[14] Nonetheless, we have long permitted these damages in breach of contract cases, so long as the evidence "with a fair degree of probability establish[es] a basis for the assessment of damages."[15] Absolute certainty is not, and cannot be required, because prospective lost profits are inherently counterfactual. In light of these principles and our modern technological and scientific advancements, we have endorsed the use of expert economic forecasting to prove the amount of these losses, to a fair degree of probability.[16]

---

[12] *See Mass. Bonding*, 22 A.2d at 714 ("[I]f it reasonably appears that profits would be realized if the contract were carried out, and that the loss of such benefits necessarily followed the breach, *their amount* may constitute the true measure of damages." (emphasis added) (quoting *Macan*, 107 A. at 753)); *Taylor v. Kaufhold*, 84 A.2d 347, 352 (Pa. 1951) (explaining that lost profits were an appropriate measure of damages where the plaintiff "proved *his loss* of profits with reasonable certainty" (emphasis added)).

[13] *Helpin*, 10 A.3d at. 270.

[14] *See Mass. Bonding* 22 A.2d at 714; *Aiken Indus., Inc. v. Est. of Wilson*, 383 A.2d 808, 812 (Pa. 1978) (plurality) (Pomeroy, J., Opinion in Support of Affirmance and Modification); *AM/PM Franchise Ass'n*, 584 A. 2d at 925 n.19.

[15] *Mass. Bonding*, 22 A.2d at 714; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a ("Damages need not be calculable with mathematical accuracy and are often at best approximate." (citation omitted)).

[16] *See AM/PM Franchise Ass'n*, 584 A.2d at 925 (explaining that "computers, economic forecasting, sophisticated marketing studies and demographic studies" can be used to calculate prospective profits); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. b (Lost profits, including prospective profits, "may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.").

In determining the amount of lost profits for the breach of a non-compete, the plaintiff's losses and the defendant's gains are a useful starting point. For example, in *Aiken Industries, Inc. v. Estate of Wilson*,[17] prospective lost profit damages were measured as follows. The non-breaching party, to which the duty not to compete was owed ("Aiken"), had twenty-five customers that constituted fifty percent of its business prior to the breach. Following the breach, Aiken's sales to those same customers declined by half, or by approximately $700,000. Meanwhile, the breaching competitor saw a corresponding increase in sales to those same customers at almost the same value. To determine lost profits, the trial court properly began with Aiken's $700,000 decrease in sales, reduced that figure by $300,000 based on other factors not attributable to the intervention of its competitor—a market recession, an industry strike, etc.—and then multiplied the difference by Aiken's net profit percentage to reach the appropriate award.[18]

As *Aiken* demonstrates, the plaintiff's losses and the defendant's gains are generally useful data points in determining the amount of lost profit damages. However, a plaintiff in Aiken's position need not, and likely cannot prove that, had its wrongful competitor never opened its doors, none of the plaintiff's customers would have left.[19] Nor can it be assumed, in a market with many competitors, that each customer gained by

---

[17] 383 A.2d 808 (Pa. 1978) (plurality).

[18] *Id.* at 812-14 (Pomeroy, J., Opinion in Support of Affirmance and Modification); *see also Am. Air Filter Co. v. McNichol*, 527 F.2d 1297, 1300 (3d Cir. 1975) (applying Pennsylvania law in a breach of non-compete case and approving a theory of damages based on the plaintiff-employer's "decrease in profits in the territory serviced by [the breaching employee] after he left [the employer]").

[19] *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 HARV. L. REV. 625, 656 (1960) ("[Non-compete d]amages are necessarily highly speculative, for if the customer is willing to go with the [breaching competitor] there is some reason to assume that he might not have continued the old relationship much longer in any event.").

the defendant was a customer lost by the plaintiff.[20] This much is true whether or not the customers (or, in the instant case, bids) lost by the plaintiff and those gained by the defendant are, in fact, the same ones, as was the case in *Aiken*. Regardless of whether the opportunities lost by plaintiff are the same as those gained by the defendant, prospective lost profits rest on the reasonable inference that the plaintiff would have enjoyed at least "a portion" of the business wrongfully gained by the defendant.[21]

In my view, Vinculum failed to establish sufficient facts to open the door to lost profit damages beyond the term of the non-compete covenant. To do so, however, it was not required to show: (a) that the consultants Goli LLC gained were the same ones whose placements Vinculum lost; or (b) that, in the outyears, Vinculum would have defeated all of its other competitors for the bids Goli LLC won, absent Goli LLC's competition.[22] Rather, the reason that Vinculum failed to establish a foundation for lost profit damages, as the Majority recognizes, is that it drew no causal connection between Goli LLC's

---

[20] *See InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1034 (Ill. App. Ct. 2012) (approving damages award where "[p]laintiffs did not allege that each lost quote opportunity would have resulted in a sale," but rather presented evidence that "led to a reasonable inference that plaintiffs would have made a portion of these sales absent defendants' competition"). On the other hand, it is possible that a plaintiff competes more directly with one competitor than it does with, say, its other 199 competitors. *See id.* at 1033 (rejecting the assumption that the plaintiffs "competed equally with every insurance agency in the relevant states, no matter the distance from plaintiffs"). And in rare cases, a market has such limited competition that it can be said that anything the defendant earned was "money practically taken out of the plaintiff's pocket." *Moore v. Colt*, 18 A. 8, 9 (Pa. 1889).

[21] *See Hallberg*, 976 N.E.2d at 1034.

[22] *See* Maj. Op. at 35 (explaining that "[a]lthough Mr. Kalantri testified that Vinculum lost six consultants and Goli LLC gained six consultants, Vinculum did not present evidence to demonstrate that the consultants Goli LLC gained were the same consultants that Vinculum lost. Notably, Vinculum also could not illustrate that, but for Goli LLC's intervention in the market, Vinculum would have been the successful vendor out of the other 200 or 300 vendors to fill those open consulting positions at PennDOT." ("client" changed to "consultant")).

breach of the non-compete covenant during its term and the lost profits that Vinculum may have suffered in later years.

At the risk of stating the obvious, Goli LLC's contractual obligation not to compete with Vinculum for bids at PennDOT ended a year after the termination of Mr. Goli's employment through Vinculum. As such, obtaining six bids for PennDOT's business after that period elapsed was not a breach giving rise to damages—the non-compete term was over. Only the bids that Goli LLC solicited or secured while the non-compete was in effect amounted to a breach of the contract. Vinculum's problem is that it does not trace Goli LLC's post-non-compete gains (and any corresponding losses that, by inference, Vinculum might be able to prove) to that breach.

In lieu of connecting these dots directly, Vinculum offered a "head start" theory of damages: because Goli LLC solicited PennDOT before the expiration of the non-compete agreement, Vinculum argues, it gained a competitive advantage in the time immediately thereafter, which in turn defeated Vinculum's expectations that Goli LLC would have a lesser ability to compete after the contract was terminated.[23] This theory—regardless of whether such damages would be reasonably foreseeable and could be proven with a fair degree of probability[24]—is simply not applicable to the facts. As the Majority explains,

---

[23]   Vinculum's Br. at 17-18; *see Hallberg*, 976 N.E.2d at 1034 ("Having started sooner (gotten a 'head start'), defendants are now in a better position to continue competing because they have already—and too soon—gotten past their post-noncompete 'ramp up.' [The] 'head start effect' is an attempt to quantify that improper post-non-compete-expiration advantage. In that regard, it also takes into account plaintiffs' loss of a bargained-for side benefit of a noncompete—the lessening of defendants' ability to compete, after the restriction expires, simply due to the passage of time."). To be clear, the relevant "improper advantage" under this theory is the advantage attributable to the defendant's early entry into the market—not, as Vinculum argued, the advantage attributable to the defendant's relationships with the plaintiff during the term of the non-compete. *See id.*; Maj. Op. at 33.

[24]   *See Helpin*, 10 A.3d at 270; *Mass. Bonding*, 22 A.2d at 714.

Goli LLC, and its success in placing consultants with PennDOT, pre-dated the Consulting Agreement.[25] Moreover, under the agreement, Mr. Goli was permitted to maintain his business, so long as that business did not solicit PennDOT.[26] Goli LLC therefore needed no "ramp-up" time following the expiration before becoming a full-fledged competitor.[27] Granted, the theory Vinculum advocates could presumably apply to a pre-existing business that has bargained to cease maintaining its relationships for a given time, such that it would not be prepared to return immediately to its former business on the expiration of the restrictive covenant. But in the instant case, Mr. Goli himself had a legitimate, ongoing relationship with PennDOT as an employee through Vinculum, at least until 2016. It would seem difficult, if not impossible, to prove that Goli LLC had a "head start" by virtue of Goli LLC's wrongful solicitation of PennDOT in 2016, rather than by virtue of Mr. Goli's sanctioned employment relationship with PennDOT in 2015.

For these reasons, I agree with the Majority that the Superior Court's order should be affirmed, albeit on different grounds from the Superior Court.

I also write separately because I am of the opinion that there must be some limit to the damages that will accrue after the expiration of a non-compete agreement.[28] Post-non-compete damages—to include those rooted in the plaintiff's expectations that the defendant will not emerge instantly from the non-compete as a more formidable competitor than it was when the agreement was entered—need only be foreseeable and

---

[25] *See* Maj. Op. at 31-32.

[26] *See id.* at 32.

[27] *See Hallberg*, 976 N.E.2d at 1034.

[28] Vinculum sought post-non-compete damages under a "head start" theory of damages. *See* Vinculum's Br. at 16-19. It seems, however, that these damages can be characterized as a species of lost profits: a plaintiff pursuing this theory seeks compensation for the relative disadvantage it sustained immediately *after* the restrictive covenant expired, resulting from the breach committed while the agreement was in effect.

reasonably certain, with their basis established to a fair degree of probability.[29]  My concern is that these damages, if not otherwise cabined to some reasonable period of time, may run afoul of our general aversion to restrictive covenants.  We have a long history of treating restrictive covenants with disfavor, and we construe them strictly, especially when they are ancillary to an employment agreement.[30]  We do so because these covenants place a "unique and heavy burden . . . upon an employee in attempting to earn a living."[31]  Therefore, we must bear in mind the weight of the burden imposed by the agreement, even as we attempt to give effect to the parties' contractual expectations.

By placing no limits on the time in which damages can be traced back to the breach of an expired non-compete, we "risk transforming finite, reasonably tailored non-competition periods into open-ended disgorgement obligations."[32]  We already have expressly limited the availability of injunctive relief to the lifetime of a non-compete.[33]  However, for the reasons explained by the Majority, we will permit *damages* incurred beyond the term of the non-compete.  Of course, in the instant case, Vinculum's claim for post-non-compete damages fails because Vinculum did not establish that the losses it

---

[29]     *See Helpin*, 10 A.3d at 270; *Mass. Bonding*, 22 A.2d at 714.

[30]     *See, e.g.*, *Hayes v. Altman*, 266 A.2d 269, 271 (Pa. 1970) ("[B]ecause restrictive covenants are a partial restraint upon the free exercise of trade, we have frequently stated that they should be strictly construed, particularly when such contracts are ancillary to an employment agreement rather than ancillary to the sale of a business."); *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 922 (2002).

[31]     *Socko v. Mid-Atl. Sys. of CPA, Inc.*, 126 A.3d 1266, 1277 (Pa. 2015).  In the instant case, it is not clear on the facts whether the non-compete agreement can be considered incident to an employment agreement.  However, this was deemed established by Vinculum's admission at the trial court.  *See Vinculum, Inc. v. Goli Technologies, LLC*, 2021 WL 5575829, at *6 (Pa. Super. Nov. 29, 2021).  In any event, this issue is not presently before this Court.

[32]     Goli LLC's Br. at 54.

[33]     *See Hayes*, 266 A.2d at 271 ("An injunction will not be granted to enforce a restrictive covenant when the restrictive period has by its terms expired.").

allegedly incurred after the expiration of the non-compete were caused by Goli LLC's breach. But assume, *arguendo*, that Vinculum were able to prove lost profits in the outyears, directly traceable to the breach. At what point, as Goli LLC continues to develop as a business apart from Vinculum, would those damages stop accruing? One can imagine these damages—attributable to the breach at the outset—growing more and more attenuated over time.

Some courts bar damages incurred post-non-compete altogether.[34] For those that permit an award of damages sustained beyond the term of the non-compete—this Court included—the question remains where to draw the line. Applying our traditional criteria for lost profits, the factfinder is left with the challenging task of determining at what point such damages, initially the consequence of the breach, have become too remote.[35] The question becomes: at what point can it be said that the plaintiff's losses are no longer fairly attributed to the breach? In making this determination, the concept of a "head start" may supply a useful limiting principle.

The *Hallberg* court adopted the theory that a defendant's wrongful "head start" in their business endeavors, in violation of a restrictive covenant, constitutes a basis for

---

[34] *See Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 900 (N.J. 2005) (rejecting damages incurred after the expiration of the non-compete agreement "because restrictive covenants are not favored in the law"); *Home Gas Corp. of Mass., Inc. v. DeBlois Oil Co.*, 691 F. Supp. 567, 578 (D.R.I. 1987) (limiting damages to the two-year period that the restrictive covenant was in effect).

[35] *See ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299, 1314 (Ill. App. Ct. 1980) ("Whether [plaintiff's] lost profits award is based on a period of one month, six months, or three years, a line must be drawn at some point; it is the factfinder's role to draw it."); *NuVasive, Inc. v. Day*, 77 F.4th 23, 30 n.7 (1st Cir. 2023) (affirming the district's court's decision not to award damages for lost profits incurred by medical manufacturer after the expiration of the non-compete "given the impact of the pandemic after that time on sales projections, the decrease in surgical needs and impact on sales revenues").

damages.[36]  The same concept has gained some acceptance, at least in theory, with respect to claims for damages arising from patent infringement.[37]  The Majority does not, and need not determine whether we, like the *Hallberg* court, would accept such a basis for damages in the non-compete context.  However, apart from its potential viability as a *basis* for damages, the "head start" concept may also serve as a limiting principle with respect to the *extent* of damages to be awarded.  In trade secret actions, for example, some jurisdictions limit the damages available "to the 'head start' or 'lead time' period, meaning the period before which the defendant would have enjoyed *legitimate access* to the secret in any event, whether through defendant's own efforts or those of someone else."[38]  Likewise, the defendant in a non-compete action might argue that damages should be limited to the period before which he presumably would have been able to achieve his success (and, to the extent proven, cause the plaintiff's corresponding losses) by legitimate means.

This issue—whether losses sustained by the plaintiff are attributable to the defendant's wrongful head start or to their subsequent, legitimate efforts—is also captured by proximate cause considerations.[39]  For example, just as the plaintiff should

---

[36]  *See Hallberg*, 976 N.E.2d at 1034.

[37]  Christopher A. Cotropia, *Post-Expiration Patent Injunctions*, 7 TEX. INTELL. PROP. L.J. 105, 112 (1998) (explaining that district courts have embraced a theory of damages that compensates plaintiffs for "future profits that will be lost in their competition with the alleged infringer after the patentee's patent expires").

[38]  William Lynch Schaller, Secrets of the Trade: Tactical and Legal Considerations from the Trade Secret Plaintiff's Perspective, 29 REV. LITIG. 729, 824-25 (2010); see generally UNIF. TRADE SECRETS ACT, § 3 cmt; *Russo v. Ballard Med. Prod.*, 550 F.3d 1004, 1020 (10th Cir. 2008); *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 434 (3d Cir. 1982) (noting "the difficulty of determining how much of the improvement is attributable to [the defendant's] independent efforts and how much to the information gained by wrongdoing").

[39]  *See* Schaller, *supra* n.38 at 824-25.

not recover lost profit damages that flow from the defendant's legitimate, post-non-compete efforts, it should not recover damages that are attributable to changes in the market or in the economy writ large. Nonetheless, the head start rule offers a discrete limiting principle with respect to the duration of time, beyond the expiration of the restrictive covenant, for which a plaintiff might seek damages that it can trace back to the breach.

Imagine, for example, that the ABC company has a non-compete agreement with its employee/budding competitor Z, pursuant to which Z may not manufacture, distribute, or sell alphabet soup for a period of two years after the termination of the agreement. The agreement expires, and Z abides by that covenant for a year-and-a-half. With six months remaining in the non-competition period, Z begins to manufacture and sell his own soup. In those six months, Z's business starts to take off, infringing on ABC's sales. At trial, ABC is able to prove that Z's success in the first two years *after the expiration* of the non-compete, and ABC's corresponding losses, flow directly from the breach. At what point can ABC no longer assess damages against Z? I would suggest that ABC may recover lost profit damages for a period of six months after the non-compete expired—the duration of Z's head start. Accordingly, damages are limited to the time it presumably would have taken for Z to achieve his success without the breach. This approach ensures that the damages do no more than compensate the plaintiff for the defendant's breach,[40] which is not that the defendant entered the market, but that it did so prematurely.

In my view, this variation on the "head start" concept is informative in determining the relevant time frame for assessing damages in the post-non-compete context.

---

[40]    *See Helpin*, 10 A.3d at 270 ("The measure of damages for breach of contract is *compensation* for the loss sustained. The aggrieved party can recover nothing more than will compensate him." (emphasis in original) (quoting *Lambert v. Durallium Products Corporation*, 72 A.2d 66, 67 (Pa. 1950))).

Distinguishing between the lost profits that flow from the breach, and those that flow from the defendant's subsequent efforts and other, unrelated circumstances, is essential to protect defendants' legitimate efforts to run a business or make a living against the heavy burden that non-compete agreements impose. While there may be case-specific circumstances that render this principle a poor reflection of the economic reality of the situation, I offer it as, at the very least, a place to start.